**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                                  :
In re:                                            :        Chapter 11
                                                  :
ABR BUILDERS LLC,                                 :        Case No.:  19-11041 (SHL)
                                                  :
                                  Debtor.         :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

### DECLARATION OF ALISON KUNOFSKY IN SUPPORT OF MOTION TO COMPEL THE DEBTOR TO REJECT GENERAL CONTRACTOR AGREEMENT AS AMENDED

I, Alison Kunofsky, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the following is true and correct:

1.     I submit this Declaration in support of the motion (the "Motion") by my husband and me to compel ABR Builders LLC (the "Debtor") to immediately reject the *General Contractor Agreement* dated as of January 2017 (as amended, the "Contract").  I am over eighteen years of age and I reside in New York, New York.  I have personal knowledge of the facts set forth herein.

**The Contract**

2.     My husband and I, through our entities G270 W. 73rd Owner LLC and A270 W. 73rd Owner LLC, are the owners of a townhouse located at 270 West 73rd Street, New York, New York (the "Property").

3.     In January 2017, we entered into the Contract with the Debtor, pursuant to which the Debtor would act as the general contractor ("GC") in connection with a gut renovation of the Property (the "Project").  Under the Contract, the Debtor was to commence work on the Project beginning February 2017, with substantial completion of the renovation to occur on or before April 6, 2018.  A copy of the Contract (without exhibits) is attached as Exhibit A.

4.     We had planned to move our family of four into the Property as our primary residence upon the completion of the Project following the anticipated completion date of April

2018.  Unfortunately, as explained below, the Debtor was unable to substantially complete the Project by the April 6, 2018 deadline.  As a result, we, the Debtor and the Debtor's principal, Bolek Ryzinski (as guarantor) ("Ryzinski") entered into a *First Amendment to Agreement for General Contractor Services* dated March 26, 2019 (the "Amendment").  A copy of the Amendment is attached as Exhibit B.  The Contract and the Amendment were assigned from me and my husband to our owner entities through an *Assignment and Assumption Agreement* (the "Assignment"), which Assignment was acknowledged and agreed to by the Debtor.  A copy of the Assignment is attached as Exhibit C.

5.    Under the Amendment, among other things, (i) the Project schedule was modified to require substantial completion by May 1, 2019, (ii) the Debtor agreed to pay certain liquidated damages in the event of its failure to comply with the modified schedule, (iii) the Debtor agreed to additional protocols for status updates and invoicing, (iv) the Debtor acknowledged and accepted its obligation to remediate the damages to the Property caused by the water infiltration in the basement of the Property, and (v) Ryzinski agreed to personally guarantee repayment of retainages made by my husband and me to the extent that any portion of the work on the Project was not completed by the Debtor.

### The Debtor's Failure to Perform the Project

6.    The Debtor's role as GC for the Project has been mired by missed milestones, defective work, and damage to the Property.  Attached as Exhibit D are pictures of the current state of the Property, which shows that the Project is far from completion, even though the Debtor commenced work on the Project ***over two years ago*** and even though the original agreed upon completion was over a year ago.  The pictures in Exhibit D also show some of the safety hazards present at the Property.  These hazards remain while the Project continues to lie dormant.  These pictures alone demonstrate the Debtor's failure to perform the services under the Contract in a

timely and workmanlike manner, and the impossibility that the Project can be completed by the amended May 1, 2019 substantial completion date.

7.      There are significant issues with the quality of work done on the Project, which the Debtor was supposed to oversee.  As examples, a large skylight at the top of six stories of stairs was substantially obscured by an improperly placed beam, and the work to correct that error resulted in almost two months of lost time on the Project.  The elevator remains unfinished and the elevator shaft presents a particularly dangerous safety hazard.  The staircase and bannister (a focal point of the townhouse) is unstable, incomplete and is without railings.  Doors, millwork and floors, left unprotected, have been scratched and damaged.  All doors (which are custom-made) were drilled with the wrong size hole and will have to be replaced and rehung if they cannot be fixed.

8.      By summer of 2018, the skilled workers needed to complete work on the façade, stairs, elevator, and other areas were no longer showing up at the Project.  By that time, we had approved six change orders with the Debtor costing an additional approximately $300,000 of work.

9.      In January 2019, as the weather was getting colder, we raised concerns with the Debtor about properly protecting the pipes from freezing.  The Debtor confirmed and assured us that the pipes were property insulated.  But on February 3, 2019, we discovered a pipe burst that had flooded the cellar with about a foot of water.  The Property incurred substantial damage to construction materials, walls, doors, insulation, internet equipment and home automation equipment.

10.     On March 14, 2019, we were informed that the Debtor's full-time on-site project manager since the inception of the Project was leaving the company the next day, again delaying the Project.

3

11.     Throughout this ordeal, the Debtor provided plausible excuses for the delays and inferior quality of workmanship—such as unforeseen conditions, labor and material shortages, and weather delays.  Having invested as much time and money into the Project as we already had, we continued to rely on the Debtor's assurances that the work could be completed.

12.     On March 23, 2019, we met with Ryzinski, who presented us with a plan for substantial completion that would allow completion of the Project based on the existing funds to be distributed under the Contract.  Following this meeting, we negotiated and entered into the Amendment, the terms of which are described above.  The Amendment further provided that my husband and I would (in accordance with Paragraph 34 of the Contract) make certain payments directly to the Debtor's subcontractors and to deduct the amount of such payments from the contract price with the Debtor.  Following the execution of the Amendment, and in reliance on the Debtor's and Ryzinski's assurances that the Project could be completed under the new timetable, we paid approximately $227,000.00 directly to the Debtor's subcontractors and vendors.

**The Chapter 11 Case**

13.     On April 4, 2019 (the "Petition Date"), just about a week after the Debtor assured us it had a plan for substantial completion of the Project, and after the Debtor had induced us to make additional payments that directly and indirectly benefitted the Debtor, the Debtor filed for bankruptcy.

14.     In a letter dated April 5, 2019 (the "Rejection Letter"), the Debtor notified my husband and me that it had filed for bankruptcy and that the Debtor could not continue its operations or the Project.  The Debtor further stated that it had determined to reject the Contract, and that it would seek this relief from the Court in the near future.  A copy of the Rejection Letter is attached as Exhibit E.  However, we have not received any motion from the Debtor to reject the Contract.

4

**The Need for Immediate Rejection of the Contract**

15.     There is an urgent need for the immediate rejection of the Contract.  I have been advised by my counsel that, unless the Court enters an order authorizing the rejection of the Contract, my husband and I are obligated to continue to honor the Contract until it is either assumed or rejected by the Debtor.  Furthermore, I have been advised by my counsel that, absent this motion, the Debtor will otherwise have until the confirmation of its chapter 11 plan to decide whether to assume or reject the Contract, and that it may be months before the Debtor seeks to confirm a chapter 11 plan.

16.     In this case, the Debtor has already informed us of its intent to withdraw as GC on the Project.  The Debtor allowed its ALT-1 building permit and its ALT-3 temporary fencing permit to expire on April 1, 2019 and April 3, 2019, respectively.  And in fact, the Debtor has not performed any GC services in connection with the Project since the Petition Date.  Thus, we are effectively without a GC to complete the unfinished work at the Property.

17.     The Project is more than a year behind schedule so we have incurred substantial costs to carry two homes for much longer than expected.

18.     We have a Certificate of No Harassment (CONH) from the City of New York which expires on May 19, 2019.  The substantial completion date of May 1, 2019 in the Amendment was agreed to in part based on the coming expiration of the CONH.  It can take many months, if not years, to obtain a new CONH and there is no guaranty that such a CONH will be issued.  Without an active CONH, we will not be able to obtain any new building permits on the Property to complete the work.  We will need to promptly retain a replacement GC to assist us in this process.

19.     Furthermore, ConEdison has attempted to close out our application for new gas and electric services several times over the course of the Project due to project delays and missed deadlines.  If ConEdison closes out a project based on non-performance of the contractor, it could

5

take months (sometimes years) for ConEdison to provide services.  We will need to promptly retain a replacement GC in order to address this issue as well.

      20.     For the foregoing reasons, we ask that the Court grant our motion compelling the Debtor to immediately reject the Contract.

Dated: New York, New York
      April 25, 2019

                                      */s/ Alison Kunofsky*
                                        Alison Kunofsky

**EXHIBIT A**
**(CONTRACT)**

# GENERAL CONTRACTOR AGREEMENT

BETWEEN

## Glen & Alison Kunofsky

AND

## ABR Builders LLC

PROJECT:    270 West 73rd Street
New York, New York 10023

**THIS AGREEMENT** (this "Agreement") is made effective as of the __th day of January, 2017 (the "Effective Date"), by and between Glen and Alison Kunofsky (the "Owner"), located at 270 West 73rd Street, New York, New York 10023, and ABR Builders LLC, with an office located at 39 W. 38th Street, Suite 1100W, New York, New York 10018 (the "Contractor"), for the Contractor to provide certain labor and services, and furnish certain materials and equipment, as described and referred to in this Agreement (the "Work"), in connection with the renovation (the "Project") of the property located at 270 West 73rd Street, New York, New York 10023 (the "Site" or "Project"). (All capitalized terms used by not defined herein shall have the meanings set forth on **Exhibit "G"** attached hereto.)

This Agreement consists of this Agreement, including all Parts and exhibits attached hereto and incorporated by reference, and any written and executed amendments to this Agreement. The Owner and the Contractor (collectively, the "Parties") acknowledge and agree that this Agreement represents the totality of the understanding between the Parties regarding the Work and the matters set forth in this Agreement, and that all of the Parties' prior discussions, negotiations, and writings are deemed merged and incorporated herein, such that this Agreement supersedes all other agreements and writings between the Parties for the Work through the Effective Date of this Agreement.

The Parties acknowledge and agree that in consideration of the above-stated acknowledgements, the parties hereto agree as follows:

## PART I: KEY BUSINESS TERMS

1. **The Work.**  The Work shall generally consist of the renovation and improvement of the real property and building located at the Site. The Work is more fully described in the Construction Documents, dated 11.09.2016, attached hereto as **Exhibit "A"**, and shall be governed by all of the terms and conditions of this Agreement.[1] The Work shall include the protections to neighboring properties and in accordance with all applicable license and access agreements between the Owner and such neighbors. Any and all such licenses and access agreements with the neighbors shall be obtained by Owner, at its expense.

2. **Contractor's Key Personnel**. The Contractor shall assign certain key personnel to supervise, oversee, and manage the Work continuously throughout the Project, as approved by the Owner, consisting of Alexander Ryzinski (the "Key Personnel"). The Key Personnel shall provide guidance, supervision, analysis, and decision-making with respect to the Work. If any of the Key Personnel become unavailable to perform the Work for reasons beyond the control of the Contractor, then the Contractor, subject to the approval of the Owner, shall promptly appoint a replacement. Upon a reasonable objection, the Owner may request that certain Key Personnel

---

[1] The Construction Documents for the DOB approved second phase (external work and back extension) shall be incorporated into Exhibit "A" by March 31, 2017, or upon approval by the DOB and the Landmarks Preservation Commission ("LPC"). External work includes all façade and other work that is subject to approval by the LPC. Should such LPC approval be conditioned upon revisions to the Drawings and Specifications (submitted to LPC and upon which Contractor based its bid), and should any such revisions increase Contractor's cost to complete or time to complete, then Contractor shall be entitled to a Change Order for both cost and time, to be agreed upon by the Owner and Contractor.

no longer work on the Project. In such an event, the Contractor shall agree to remove such Key Personnel as soon as practicable and, subject to the approval of the Owner, replace such Key Personnel with an employee of equal or greater skill/experience. Failure to provide the Key Personnel shall be a deemed a material breach of this Agreement.

3. **Contract Price**.   The Owner agrees to pay the Contractor for the full and satisfactory completion of its Work and the performance of all of the obligations set forth in this Agreement a lump sum price of **Three Million Five Hundred Forty-Three Thousand Five Hundred Six Dollars and Six Cents ($3,543,506.06)** (the "Contract Price"), allocated in accordance with the ABR Estimate, dated December 13, 2017, and Schedule of Values, attached hereto as **Exhibit "B"**. The Owner shall pay the Contractor a Downpayment towards the performance of the Work and the Contract Price, payable as ten percent (10%) of the Contract Price upon execution of this Agreement. The Downpayment shall be recorded as the first payment and allocated to approximately 10% of each item of the Schedule of Values.

   3.1. The Contractor represents and accepts that it has been given an opportunity to and has visited, inspected, surveyed, and tested all applicable areas of the Project where the Work shall be performed, including the surrounding areas, to determine, verify, and document all existing conditions or other potential conditions which could impact the Work, and has requested from, and consulted with, any necessary parties, and been provided with, all information concerning the Work, Project, and its conditions so as to properly perform the Work within the Contract Price and in accordance with the Project Schedule.

   3.2. The Contractor represents and accepts that the Contract Price is based upon the Contractor's review, inspection, and acceptance of the site conditions and this Agreement, and acceptance of all foreseeable conditions and events that may occur over the course of the Work.   The Contractor represents that it fully understands the design intent and elements of construction shown in the Construction Documents, including all associated work, labor, materials and supplies, insurance, tools, equipment, permits, licenses, taxes, approvals, transportation, testing of systems and equipment, and any other service required to complete the Work within the Contract Price and in accordance with this Agreement.

   3.3. The Contractor represents that, based upon the foregoing, it shall make no claims, and waives all rights against the Owner and the design professionals, for change orders and payment above the Contract Price due to any foreseeable conditions and events that may occur over the course of the Work and/or claims of design errors or omissions in the Construction Documents.

4. **Project Schedule**. The Contractor agrees that time is of the essence in the performance of its Work, and as such, agrees that it will strictly adhere to the project schedule (the "Project Schedule") set forth below. The Contractor acknowledges and agrees that it shall not be entitled to any compensation above the Contract Price, including for any overtime, to meet the Project Schedule, unless expressly authorized by the Owner pursuant to this Agreement. The key milestone dates are as follows:

   4.1. The commencement date of the Contractor's Work shall be **Feb 6th, 2017**.

**4.2.** The date of Substantial Completion of the Contractor's Work shall be on or before **April 6th, 2018**.

**4.3.** The date of Final Completion of the Contractor's Work shall be within sixty (60) days after Substantial Completion.

5. **Owner's Project Objectives.** The Contractor acknowledges the Owner's objectives in having the Work performed (the "Project Objectives"), which include the following:

**5.1.** Renovating a townhouse that reflects the aesthetics, integrity, and design of the Contract Documents;

**5.2.** Engaging a Project Team that cooperates fully with the Owner and the other members of the Project Team;

**5.3.** Completing the Work within the Contract Price and in accordance with the Project Schedule;

**5.4.** Avoiding delays in the Work;

**5.5.** Minimizing unnecessary disturbance outside of the Work areas, including to the existing building and neighboring units, and in accordance with all applicable laws, rules, regulations, and building rules and policies; and

**5.6.** Any other Project objectives of which the Owner advises the Contractor.

6. **Notices**:    All notices required pursuant to this Agreement shall be sent to the parties at the address provided below:

      If to Owner:        Glen & Alison Kunofsky
                            170 W. 73rd St., Apt. 11B
                            New York, New York 10023
                            Attn: Glen Kunofsky

      If to Contractor:    ABR Builders LLC
                            39 W. 38th Street, Suite 1100W
                            New York, New York 10018
                            Attn: Alexander Ryzinski]

7. **Governing Law**:  This Agreement shall be governed by the laws of the State of New York, without reference to rules governing choice and/or conflicts of law.

8. **Jurisdiction**:  The parties agree and consent to the jurisdiction of the appropriate court in the County of New York in the State of New York to resolve any dispute arising under this Agreement.

9.  **Counterparts**: This Agreement may be executed in counterparts and a signed copy, transmitted by email or fax, shall be deemed an original for purposes of execution.

**PART II: TERMS AND CONDITIONS**
1.  **Representations.**

    a.  The Contractor represents the following:

        i.  It has the requisite expertise and skill, and accepts the responsibility, to perform, and oversee the performance of, the Work in accordance with this Agreement.

        ii.  It has engaged a Project Team, including its subcontractors, who have performed work of similar scope and nature in the past and have the depth of knowledge, experience and appropriate staff and skill to properly perform the Work in accordance with this Agreement.

        iii.  The Work shall be performed in accordance with (i) this Agreement; (ii) all applicable and governing laws, rules, and regulations, including, but not limited to, the applicable building code; and (iii) all applicable license and access agreements between the Owner and neighboring properties. However, because such access agreements do not yet exist, should such access agreement(s) be conditioned upon revisions to the Drawings and Specifications (upon which Contractor based its bid), and should any such revisions increase Contractor's cost to complete or time to complete, then Contractor shall be entitled to a Change Order for both cost and time, to be agreed upon by the Owner and Contractor.

    b.  The Owner represents the following:

        i.  It has the financial ability to pay for the entirety of the Work.

        ii.  It has examined, as laymen and non-design professionals, the Drawings and Specifications; and has been advised by its design professionals that the Drawings and Specifications reflect the scope and intent of the Owner's desired Work.

2.  **Construction Documents.** With respect to the Construction Documents attached hereto as **Exhibit A**, the Contractor certifies (and shall certify with respect to the Construction Documents for the "external work" and "back extension" when issued) the following:

    a.  It has examined the Construction Documents extensively and in detail, and verified and coordinated the information contained therein with respect to the requirements of the Work;

    b.  It fully understands the design shown in the Construction Documents, including any addenda to the Construction Documents, and that all elements depicted within the Construction Documents and addenda are included in the Contract Price, which is necessary for the proper execution and completion of the Work;

c.  It has identified all means and methods required to perform the Work in the Construction Documents and addenda, and all reasonable inferences and interpretations that may be made from the same;

d.  The Contract Price fully, fairly, and accurately reflects the work, labor, materials and supplies, insurance, tools, equipment, permits, licenses, taxes, approvals, transportation, testing of systems and equipment required to complete the Work; and

e.  Upon request of the Owner, the Contractor shall provide evidence, in the form of a certificate of compliance, that the Work was completed in accordance with the Construction Documents and all applicable laws, rules, and regulations.

3.  **Coordination**. The Contractor acknowledges that the Work requires coordination, focus, collaboration, and harmony amongst the Owner and Project Team. The Contractor agrees to work closely and collaboratively with the Owner and the Project Team to accomplish the Owner's Project Objectives set forth in Part I.

4.  **Means & Methods.** The Contractor shall be solely responsible for all means, methods, techniques, sequences, and procedures within the scope of the Work.

5.  **Work Site Requirements.** The Contractor shall remove and dispose of all waste materials and rubbish in accordance with all applicable laws, codes, regulations, ordinances, or orders or directions issued by any governmental agency having jurisdiction over the Project. The Contractor shall maintain a log of all disposal tickets and provide a copy to the Owner as part of Contractor's close-out documentation. Prior to Final Completion of the Work, or earlier where applicable, the Contractor shall remove all temporary facilities, as well as all supplies, tools, construction equipment, machinery and surplus materials and leave such areas in a broom clean condition. Any Work that is materially damaged by the Contractor or its sub-contractors shall be replaced, refinished, or replaced, if necessary, at no additional cost to the Owner.

6.  **Safety.** The Contractor shall prepare and enforce a security and safety plan to protect all persons, material, equipment, real property, and personal property situated on or near the Site in accordance with all applicable laws, rules, regulations, statutes, local laws, and the following agreements that the Contractor or the Owner may be a party to: insurance policies, and surety policies. The Contractor shall be responsible for initiating, maintaining and supervising all safety procedures and programs in connection with the Work. The Contractor shall designate a responsible member of its organization at the Site, whose duty shall be the promotion of safety and prevention of accidents, and who shall be responsible for enforcing all governmental laws, rules, regulations and Owner directives. This person shall be certified, if required, by any governmental agency or organization having jurisdiction over the Project, and shall be the Contractor's superintendent unless otherwise designated by the Contractor in writing to the Owner.

a. The Contractor shall not use in connection with the Work or store at or near the Site, any explosives, unless explicitly authorized in writing by the Owner for execution purposes only. The Contractor shall not permit open burning on the Site. The Contractor shall provide a fire watch during all open flame activities, if any.

b. The Contractor shall permit only authorized personnel on the Site, and maintain Site security approved by the Owner.

c. The Contractor shall conduct daily inspections of the Site and ensure that all subcontractors comply with all Federal, State and local safety, health, environmental protection and other requirements, laws, rules and regulations applicable to the performance of the Work. The Contractor shall take all reasonable precautions for the safety of, and provide all reasonable protection to prevent damage, injury, or loss, to all of its employees at the Site, the Owner's employees, all other persons who may be affected thereby, and all property at the Site, adjacent to the Site, or otherwise used in connection with the Work. Such safety and security precautions shall be designed to take into account all risks associated with the location of the Site and may include, to the extent reasonably necessary or appropriate to provide adequate protection, fences and security guards or watchmen.

7. **Labor Harmony**. The Contractor shall be responsible for labor harmony for its Work. If, for any reason, any labor employed directly or indirectly through a subcontractor or by the Contractor engages in any action taken with the intent of impeding or stopping the progress of the Work, or individually or in concert with others engages or participates in any unlawful strikes, slow-downs or in any other withholding of or interference with Work (including honoring pickets or picket lines, improperly performing Work required to be performed under this Agreement, turning away deliveries or making claims resulting in Work jurisdiction disputes), that impede or stop the progress of the Work, the Owner shall have the right to require that the Contractor take all necessary and immediate action to bring about a return to normal operations. If the Contractor fails, in the reasonable opinion of the Owner, to take prompt remedial action, the Owner shall have the right, after forty eight (48) hours' notice to the Contractor, to (a) arrange for the performance of the Work, and (b) back-charge all costs and expenses connected to such action and delays to the Contractor, including all legal, accounting, administrative and other direct expenses.

8. **Work Progress Updates**. The Work shall commence upon written notification from the Owner to proceed. The Contractor shall provide the following reports, logs, lists, or other documentation, in a format approved by the Owner, concerning the progress of the Work, and made available to Owner, at Owner's request, no more than weekly, as follows:
a. On a weekly and monthly basis:
   1. logs of all field directives and changes in the Work necessitated by reason of the Owner's changes, concealed field conditions, design errors or omissions or other unforeseen events;
   2. a manpower report detailing the exact number of work force on-site by each subcontractor;
   3. a report detailing construction material deliveries;

4. all job meeting minutes;
5. report detailing whether the Work is proceeding per the Project Schedule (including photos, status of Work, and updated schedule), and if not, what actions are being implemented to meet the Project Schedule; and
6. list of open submittals and Requests for Information (RFIs) requiring action by the Owner or the Project Team.

b. As required by the Owner:
1. a change order log, listing the following items in complete detail with all information required pursuant to this Agreement;
2. requests for change orders prepared and issued by the Contractor to be submitted for the Owner's review and written approval during the course of the Work;
3. all pending unapproved request for change orders and field change authorizations;
4. all previously approved change orders and field change authorization;
5. an update of the Project Schedule, with a look-ahead highlighting critical milestones;
6. current shop drawing and submittal logs and submittal schedule;
7. list of long-lead critical materials and equipment order status;
8. a log of all RFIs, setting forth all pertinent information with respect to such RFIs including, but not limited to, the date(s) each such RFI was submitted by the Contractor and the date(s) of any response to each RFI;
9. progress reports;
10. high-resolution digital progress photographs of the Work; and
11. detailed cost forecasts/reports.

9. **Submittals**. The Contractor shall schedule, receive, review, and coordinate the submission of all required submittals, including Shop Drawings, Samples, and product data, and coordinate with the Project Team to quickly resolve submittal review issues, and pursue the diligent approval by the Project Team of all submittals, while keeping the Owner advised of the status of such approvals.

a. Prior to submitting any submittals for review, the Contractor shall prepare and submit to the Owner and Project Team a submittal schedule, which sets forth (i) the anticipated dates of submittals; (ii) the type of submittal; (iii) the approximate quantity of submittal documents to be reviewed; and (iv) any special review instructions. Any submittals submitted out of sequence shall be accompanied by specific instructions for reasonable review and turnaround time, subject to approval by the Owner.

b. All submittals by or through the Contractor shall be thoroughly reviewed by the Contractor and clearly identify the relevant specifications section before submission to the Owner.

c. All submittals must be dated, numbered in a logical consistent manner, and properly identified. Revision submissions shall be identified/numbered per the original submission.

10. **Samples**. The Contractor shall furnish sufficient samples of specified materials in the Construction Documents that may be of a considerable range of color, graining, texture, or other characteristic. Unless otherwise called for in the various sections of the Construction Documents, samples shall be submitted to the Owner and the applicable Project Team. All samples shall be marked, tagged, or otherwise properly identified with the name of the Contractor, the purpose for which the samples are submitted and the date, and shall be accompanied by a letter of transmittal containing similar information, together with reference to the appropriate section of the Construction Documents.

11. **Substitutions**. The Contractor shall submit all proposed substitutions of any submittal sufficiently in advance of the original submission due date in order for the substitution to be considered by the Owner. In the event a substitution is required to replace a discontinued or unavailable item, the Contractor must submit documentation for such substitution. The Contractor must establish a bona fide reason for a substitution, describe any differences in appearance, function, features, and first cost and operating cost data from the originally specified item, and satisfy the intent of the Construction Documents. Acceptance of substitutions shall not relieve the Contractor from responsibility to ensure coordination of the substitution with all other aspects of the Work and for compliance with all of the requirements of this Agreement. The Owner, in its sole but reasonable discretion, may reject proposed substitutions.

12. **Mold Prevention**. The Contractor shall ensure that the building envelope is water tight and that the Work shall otherwise be free from water infiltration or leaks, as consistent with the ordinary standard of care for contractors performing similar work and services for this type of project in this location. The Contractor shall, at all times, keep all interior areas of the Work and all water sensitive materials stored on the Site dry and free from moisture and water infiltration and shall erect or cause to be erected any necessary vapor and water barriers in order to ensure the absence of water infiltration. The Contractor shall be responsible to prevent and promptly contain and remove all mold contamination arising out of or related to the Work and to remediate all Work that is damaged by mold contamination as a direct result of Contractor's breach of this Section 12, none of which shall impact the Project Schedule. The Contractor shall have full access to the Site to comply with this provision.

13. **Permits/Approvals**. The Contractor shall secure and deliver to the Owner all governmental consents, permits, licenses and approvals customarily obtained by a Contractor and its subcontractors performing services and functions similar to the Work.

14. **Start-up and Operation**. Prior to Substantial Completion of the Work, the Contractor shall perform the initial start-up, testing, and operation of the Project's equipment and systems needed for occupancy to ensure that all components of the Work are operational and perform as intended in conjunction with all other components of the Project prior to the Owner's occupancy.

15. **Punch List**. Prior to Substantial Completion of the Work, the Contractor shall prepare an initial list of incomplete or unsatisfactory Work and submit it to the Architect, Owner and Design Consultants to assist in the preparation of a punch list. The Contractor shall promptly,

and with all reasonable diligence, perform, or cause to be performed, all Work necessary to complete the items set forth on the punch list in accordance with the terms of this Agreement and in a manner satisfactory to and approved by the Owner and the design team with commercially reasonable diligence and promptness. Failure to so timely correct the Punch List Work shall result in the right of the Owner, upon fifteen (15) days notice to the Contractor, to assess the Contractor one and one-half (1.5) times the value of the punch list Work as reasonably determined by the Owner to be used to remediate the punch list Work.

16. **Notice of Substantial Completion**. The Contractor shall provide written notice to the Architect and Owner that the Work has achieved Substantial Completion.

17. **Final Testing**. Prior to Final Completion of the Work, the Contractor shall assist the Owner and the Project Team in the commissioning of the Project and perform all required final balancing tests, inspections and sign-offs for the Work.

18. **As-Built Record Drawings**. The Contractor shall update as-built drawings on a commercially reasonable ongoing basis throughout the progress of the Work. Prior to submitting its application for final payment, and together with its subcontractors, the Contractor shall provide a complete set of as-built drawings to the Architect and Owner for their review. The Contractor shall maintain an accurate record of all deviations from the Construction Documents which occur in the Work as actually constructed, and shall submit to the Owner one (1) set of complete information, including descriptions, drawings, sketches, marked prints, and similar data, indicating the as-built conditions. Such information shall also be submitted in electronic format (DWG, PDF) acceptable to the Owner.

19. **Additional Work/Services**. No additional work or services shall be performed by the Contractor without the Owner's prior written approval. If the Contractor performs any approved additional work or services, which is (i) not reasonably within the scope of Work; (ii) not set forth in the Work described in the Construction Documents; or (iii) not resulting from a change order as specifically approved pursuant to this Agreement, it shall be compensated on a time and materials basis, in accordance with the hourly rate schedule attached hereto as **Exhibit "C"**, or as mutually agreed upon by the Parties in writing. Additional work shall otherwise be performed under the same terms and conditions applicable to the Work herein. The Contractor specifically waives any right to assert a claim against the Owner for any services or work performed without prior written approval from the Owner.

20. **Compliance with Project Schedule**. In complying with the Project Schedule, the Contractor shall:

   a. Coordinate the scheduling of the Work with the Project Team;

   b. Conduct job and coordination meetings with subcontractors, suppliers, and/or vendors, which shall be held as required to maintain the Project Schedule and expedite completion of the Work as necessary;

c.  Attend all meetings that the Owner reasonably requests the Contractor to attend;

d.  Prepare detailed written minutes of every job and coordination meeting attended by Contractor and furnish copies to all attendees, the Owner, and such other parties as are reasonably designated by the Owner to receive such minutes;

e.  Prepare and maintain a record keeping system, which includes all information and documentation required pursuant to this Agreement. Copies of all correspondence and records pertaining to the Work shall be maintained by the Contractor and made available at all reasonable times to the Owner; and

f.  Make no claim for damages, payment, additional compensation, or increase in the Contract Price due to any delays caused by the Contractor or its subcontractors in the performance of any of the Work that results in the Contractor's inability to meet the Project Schedule.

21.  **Notice of Non-Compliance**. The Contractor shall notify the Owner immediately, in writing, if the Contractor is unable to comply with the Project Schedule. If the Contractor falls behind in the Project Schedule for any reason other than an Unavoidable Delay, as set forth in Paragraph 22 below, for which the Contractor has received an extension of time, the Contractor shall take whatever steps necessary to improve its progress and demonstrate the manner in which the lost time shall be regained. For any delay other than an Unavoidable Delay, it shall be the responsibility of the Contractor to increase the number of men, the number of shifts, the days of work and/or, to the extent permitted by law, to institute overtime operations, all at the cost of the Contractor and without an increase in the Contract Price, in order to regain any time lost and maintain the Project Schedule.

22.  **Unavoidable Delay**. An "Unavoidable Delay" occurs when a delay is incurred through no fault of the Contractor, its subcontractors, suppliers, or vendors, and only as defined in the circumstances defined within this provision. To the extent there are Unavoidable Delays in the performance of the Work, the Owner shall extend the Project Schedule appropriately to reflect such delay. Unavoidable Delays shall be deemed to include only delays caused by:

a.  Strikes or labor disputes (not caused by or related to any act or omission of the Contractor or any of its subcontractors, vendors, or materialmen);

b.  The unavailability of labor and materials (to the extent that such unavailability could not have been reasonably foreseen by the Contractor);

c.  Fire (not caused by the negligence or willful misconduct of the Contractor or its subcontractors);

d.  Enemy action, rebellions, riots, insurrection or acts of terrorism;

e.  Floods (not caused by the negligence or willful misconduct of the Contractor);

11

    f.   Freight embargoes;

    g.   The discovery of concealed and hidden conditions that could not have been reasonably known or foreseen prior to discovery during construction;

    h.   Failure of the Owner or the Project Team to provide Construction Documents as provided in the Project Schedule or to timely respond to RFI's, submittals, or requests for change orders, provided that the Contractor has used its best efforts to minimize such delay by, including, but not limited to, providing the Owner and the Project Team written notice of reasonably foreseeable delays resulting out of any such failures, while continuing to perform all other Work;

    i.   Errors in the Construction Documents made by a licensed design professional in calculation or building code interpretation that the Contractor could not have reasonably been observed, detected, or inferred from reviewing the Construction Documents or inspecting the Site prior to discovering such error; and

    j.   Changes in the requirements of governmental authorities with jurisdiction over the Work, to the extent that such changes were not known prior to the date of this Agreement.

23.   **Claim for Unavoidable Delay**. To the extent the Contractor claims an Unavoidable Delay, the Contractor shall give written notice to the Owner of such claim within ten (10) days after the discovery by Contractor of any Unavoidable Delay, which notice shall set forth in detail the nature of each Unavoidable Delay, the date or dates upon which each delay began and ended, a statement setting forth the Contractor's efforts to avoid the delay, and the number of days of delay attributable to each such delay, if known. Any claim submitted by the Contractor pursuant to this Paragraph must reasonably demonstrate, with consideration of any concurrent delays, the effect of the Unavoidable Delay on the Project Schedule, and shall reflect the number of critical path delay days incurred. The Contractor's obligation to fully comply with all requirements of this Paragraph is a condition precedent to securing an extension of time or any other compensation for an Unavoidable Delay under this Agreement and a failure to do so shall constitute a waiver of any claims for time extension under this Agreement.

    a.   In the event of an Unavoidable Delay, the Contractor's sole remedy against the Owner shall be to apply for: i) an extension of time under the Project Schedule then in effect; and ii) reimbursement of the reasonable actual costs incurred by the Contractor as a result of such delay. The number of days by which the Project Schedule shall be extended, and any reimbursement, resulting from an Unavoidable Delay shall be ultimately determined by mutual consent of the Parties.

24.   **Substantial Completion of Work**. When the Owner reasonably deems the Work Substantially Complete, the Contractor shall be provided with a Certificate of Substantial Completion and a punch list of Work items remaining to be completed prior to Final

Completion. The Certificate shall specify the date, as appropriate, of Substantial Completion. The delivery of a Certificate of Substantial Completion shall not terminate or alter the Contractor's obligation to complete the Work in conformity with this Agreement.

25. **Final Completion of Work**. When the Work is Finally Complete, the Contractor shall be provided a certificate of completion. The certificate of completion shall specify the date of Final Completion of the Work. The delivery of a certificate of completion shall not terminate or alter the Contractor's guarantees and obligations to complete the Work in conformity with this Agreement.

26. **Subcontracts**. Unless otherwise agreed to in writing by the Owner, all Work to be performed and materials, supplies, and equipment to be furnished in connection with the Work shall be performed by subcontractors pursuant to written subcontracts awarded by the Contractor in the Contractor's name, and not as agent for the Owner, which shall bind each subcontractor to all applicable provisions in this Agreement. The subcontract shall conform all material terms of the subcontractor's work to the terms of this Agreement. The Contractor warrants that it is fully responsible for the Work of its subcontractors and that all of its subcontractors shall be qualified and licensed within their respective trades.

   a. The Contractor shall obtain the Owner's written approval prior to awarding a subcontract to a subcontractor with whom Contractor has never before worked, such approval not to be unreasonably withheld or delayed. No portion of the Work shall be performed until such subcontractor, and the applicable subcontract, has been reasonably approved by the Owner, and the subcontract for the same has been entered into between the Contractor and the subcontractor in question and a copy of the executed subcontract has been delivered to the Owner within five (5) days after it is entered into.

   b. The Contractor shall require each subcontractor (i) to be bound by the terms of this Agreement; (ii) to assume toward the Contractor all of the obligations and responsibilities which the Contractor, by this Agreement, assumes toward the Owner; and (iii) to grant to the Contractor all of the rights which the Contractor, by this Agreement, grants to the Owner. The Contractor shall require each subcontractor to enter into similar agreements with its sub-sub-contractors (if any). The subcontracts shall each include retainage of 10%.

   c. Nothing contained in the subcontract shall create any contractual obligation between any subcontractor and the Owner; provided, however, that each subcontract shall provide that the Owner, at the Owner's option, shall have the right to cause the subcontractor to perform, for the benefit of the Owner, the remainder of the Work covered by such subcontract in the event that this Agreement is terminated, so long as the Owner shall have paid to the Contractor all undisputed amounts then due to such subcontractor.

   d. The Contractor acknowledges that all subcontracts and agreements with suppliers and vendors shall be assignable to the Owner or the Owner's designee (at the Owner's sole option) upon default by Contractor and at the Owner's written request. In such event, the Owner shall assume only those liabilities of the Contractor thereunder arising after

the date of such assignment except for such monies as may be contractually owed to the Contractor for such subcontracts but not paid by the Owner prior to such assignment. Nothing contained herein shall be deemed to release the Contractor from liability to any subcontractor or to the Owner in connection therewith for any occurrence prior to the date of such assignment.

e. The Contractor shall require that each subcontractor maintain in full force and effect until final payment is made under such subcontract, and for the period specified following Final Completion, the insurance required by the Owner under Section 27 of this Agreement.

f. The Contractor shall resolve all disputes between the subcontractors relating to the construction means, methods, techniques, sequences and procedures concerning the performance of their work, without the involvement of the Owner. The Contractor shall consult with the Owner to the extent such dispute shall impact the Contract Price.

g. The subcontractors and materialmen shall be required to furnish executed waivers of lien, in the same form as the lien waivers required of Contractor as set forth in **Exhibits "D" and "E"**, for the Work done and materials furnished through the date covered by the last preceding Application for Payment.

27. **Insurance**. The Contractor, prior to the commencement of the Work and Services, shall procure insurance, as more fully set forth in **Exhibit "F"**, covering the Contractor, the Owner, and others as the Owner may designate as insured parties. The Contractor shall furnish an original Certificate of Insurance, with all appropriate declaration and endorsement pages, containing waivers of subrogation as provided herein prior to performing the Work. Broker generated documentation shall not be accepted. It is expressly agreed and understood by and between the Owner and the Contractor that the insurance afforded the Additional Insureds shall be primary insurance and that any other insurance carried by the Owner shall be excess of all other insurance carried by the Contractor and shall not contribute pro rata with the Contractor's insurance.

a. Notwithstanding the intention of the Owner to secure these materials prior to the commencement of the Project, commencement shall not constitute a waiver of the Contractor's full obligations to provide such evidence and to provide the required and agreed upon insurance under this Agreement.

b. The provisions of this Article are not intended to, and shall not release or excuse the Contractor or any subcontractor from any of their respective obligations under this Agreement or the subcontracts, including, without limitation, the Contractor's obligation to indemnify the Owner in the manner and to the extent provided in this Agreement or by law.

c. If any of the insurance coverages under this Agreement are required to remain in force after final payment, an additional certificate evidencing continuation of such coverage shall be submitted with the final Application for Payment, and thereafter at least thirty (30) days prior to the renewal date of such insurance.

28. **Intentionally Deleted.**

29. **Indemnification**. To the fullest extent permitted by the applicable law governing this Agreement, the Contractor agrees to defend, indemnify, and hold harmless the Owner, its affiliates and subsidiaries, their respective officers, directors, partners, employees and agents, and any other Additional Insureds, as well as their respective officers, directors, partners, employees, and representatives (collectively, the "Indemnitees"), from and against any claim (including neighbor claims), cost, judgment, lawsuit, damage, expense or liability, including reasonable attorneys' fees, attributable to personal injury, bodily injury, economic loss sickness, disease, death, trademark, copyright or patent infringement, unfair competition or infringement of any Indemnitees' personal or property rights, for defamation, false arrest, malicious prosecution, or to damage to or destruction of property, whether of the Indemnitees' or third persons', including loss of the use thereof (collectively, "Damages") caused by, arising out of, resulting from or occurring in connection with the performance of the Work by, a breach of this Agreement by and/or any act or omission of the Contractor, its subcontractors or its respective agents or employees. In the event any provision of the foregoing indemnification is deemed void and/or unenforceable, in whole or in part, such indemnification shall otherwise apply to the fullest extent permitted by applicable law. The indemnification obligation under this Paragraph shall not be limited by a limitation on amount of damages, compensation or benefits payable by or for the Contractor or a subcontractor under workers' or workmen's compensation acts, disability benefit acts, or other employee benefit acts.

   a. The provisions of the indemnity provided for herein shall not be construed to indemnify any of the Indemnitees for liability or damages caused by their own negligence or fault of any Indemnitee for whom the Indemnitee(s), and not Contractor, are responsible.

   b. The Contractor shall cause the foregoing indemnification agreement by the Contractor to be included in each subcontract between the Contractor and a subcontractor, and shall be in favor of each of the Indemnitees and the Contractor, and at the Owner's request, the Contractor shall provide evidence satisfactory to the Owner that it has fulfilled its obligation under this Paragraph.

   c. The indemnifications afforded pursuant to this Paragraph that requires performance by either party subsequent to the expiration or termination of this Agreement shall survive such expiration or termination.

30. **Change Order**. A "Change Order" shall be the written instrument, signed by the Owner and the Contractor, required to authorize any change in the Work, without invalidating or abandoning this Agreement, which would become a change to this Agreement and result in (i) a change in the basic character or design of the Work, including additions, deletions or other revisions to the Work; (ii) a deviation from design standards established by this Agreement for the Work; (iii) an extension of the date for Substantial Completion and/or the date for Final Completion; and/or (iv) an increase or decrease in the Contract Price. Contractor shall be under no obligation to perform any changes in the Work or Schedule without a Change Order signed by both Parties.

15

31. **Change Order Process**. A Change Order may be initiated through one of the following processes:

   a. **Owner Request.** The Owner may authorize a change in the Work by issuing a request and, as applicable, directing the Architect to prepare the necessary design documents to reflect the change, which shall be reviewed and approved by the Owner in writing. The Owner or Architect, as applicable, shall then deliver a written request to the Contractor to review the request and, as applicable, the newly issued design documents. The Contractor shall then prepare a change order within twenty-four hours of receiving the request and, as applicable, the design documents, to perform the work or changes specified therein, which shall include a cost estimate and an estimate of the Project Schedule adjustment. If the Owner shall authorize the Contractor's change order, Owner shall do so in writing, which shall result in a Change Order reflecting the reasonable value of the Work performed.

   b. **Contractor Request.** To the extent the Contractor submits a change order request, it shall do so by providing all information and documentation required by the Owner, including, but not limited to, suitable breakdowns of the cost of the proposed change by trade and work classification, as well as the Contractor's detailed estimate of the cost and schedule impact of such change. For each change request, the Contractor shall show calculations of the cost of such change by one or more appropriate methods determined by the Owner and the Contractor: (i) unit prices, using a unit price schedule submitted to and approved by the Owner pursuant to this Agreement; (ii) Lump Sum price; (iii) if pre-approved by the Owner, the Contractor may propose time and material costs, based on costs and mark-ups as submitted and approved by the Owner; or (iv) if pre-approved by the Owner, the Contractor may propose cost-plus fee, based on costs and mark-ups as submitted and approved by the Owner.

   c. **Change Order Dispute**. The Contractor agrees to proceed with all other Work without delay and without regard to any dispute, controversy, or claim with respect to a Change Order, including the pendency of any action, mediation, or arbitration proceeding, provided Owner continues to make payments on all other such Work as same become due. The Contractor shall not be required to perform any Change Order work until such dispute, controversy, or claim is resolved with respect to such Change Order.

32. **Field Change Authorization**. A Field Change Authorization represents a minor change resulting in an addition, revision, substitution or deletion made to the Construction Documents.

33. **Unauthorized Work**. Any work performed by the Contractor which is contrary to the Work required by this Agreement and/or is not authorized in writing by the Owner under this Agreement shall be performed at the Contractor's sole risk, cost and expense.

34. **Applications for Payment**. The Contractor shall submit to the Owner and the Owner's representative for review, certification and approval, an Application for Payment on a

monthly basis setting forth the following in complete detail (i) the cost of the Work incurred by the Contractor in connection with the Work performed for the calendar month for which the Contractor is seeking reimbursement; (ii) the total cost of the Work performed by subcontractors, including all adjustments by Change Order, the total amount paid to the date of the Application for Payment by the Owner to the Contractor, the amount retained by the Owner to the date of Application for Payment, the total amount of the current Application for Payment, and the balance due on the Contract Price after the Owner pays the current Application for Payment; and (iii) the percentage completion of the Work to be verified by the Owner. The Application shall further:

    a.  Accurately represent the percentage Work completed on Site and materials ordered and paid for;

    b.  Include all executed partial lien waivers in the form attached hereto as **Exhibit D** in favor of the Owner for the Work completed as required from the Contractor and its subcontractors under this Agreement, which waivers shall not be effective or enforceable unless the entirety of the payment referenced in any such waiver has in fact been made;

    c.  Include all supporting data required of the Owner, the Owner's lender, or insurance claims representative, if applicable; and

    d.  Certify that the Work, which is the subject of such Application for Payment, has been performed in strict accordance with this Agreement.

35. **<u>Review of Applications</u>**. Within seven (7) days, and subject to lender review, the Owner shall approve or disapprove all or a portion of the Application for Payment (including the Application for Final Payment) by written statement, describing the items not approved.

    a.  In the event there is a dispute with the Application for Payment, such that the Application for Payment cannot be certified in whole or in part, the Owner shall notify the Contractor of its disapproval in writing. The Contractor shall have the opportunity to cure the defect in the Application for Payment and resubmit same to the Owner for approval as part of the next monthly Application for Payment.  Failure by Owner to, in writing, approve or disapprove all or any part of any Application for Payment shall be deemed an approval of any and all such Applications for Payment.

    b.  The Owner shall pay to the Contractor that amount which has been approved by the Owner within three (3) days of the approval, less Retainage in the amount of ten percent (10%) of the amount of each Application for Payment until Substantial Completion of the Work. Upon Substantial Completion, the Owner shall release fifty percent (50%) of the held Retainage so long as the cost to complete the Work does not exceed the amount retained, in which case such additional amount shall be withheld until such additional items are completed.

c. The Owner's progress payments for the Work shall not constitute acceptance of such Work or relieve the Contractor of its responsibility to complete and provide all warranties and guarantees related to the Work in accordance with the terms and conditions of this Agreement.

d. The Owner reserves the right to issue payment checks for portions of an Application for Payment or the Final Payment payable jointly to the Contractor and any subcontractor or vendor. If the Contractor fails to pay its subcontractors for Work, the Owner further reserves its right to make payments directly to the subcontractor for the Work and deduct the amount of such payment from the Contract Price.

36. **Final Payment**. Within sixty (60) days following the date of Final Completion of the Work, and as a condition to full and Final Payment to the Contract, the Contractor shall deliver to the Owner the following:

a. All as-built Drawings and documents prepared in connection with the Work;

b. All operations and maintenance data, manuals, instructions, warranties, guarantees, certificates, operating manuals, maintenance instructions, test results, and other documents required by this Agreement and the relevant submittals to the Owner as set forth in this Agreement;

c. A Final Application for Payment setting forth the cost of the Work due and remaining unpaid in connection with the performance of the Work;

d. All documents necessary for Owner to obtain all governmental sign-offs and approvals required in connection with the Work;

e. Evidence, satisfactory to the Owner, that the Work is free from all liens and claims (other than those covered by insurance without reservation of rights) arising in connection with the Work performed or materials, supplies or equipment furnished by its subcontractors;

f. Final waivers of liens and general releases, executed by the Contractor and each of its subcontractors, materialmen, vendors and suppliers waiving their right to file any mechanic's liens in connection with Work performed or materials, supplies, or equipment furnished pursuant to their subcontracts; and

g. Evidence, satisfactory to the Owner and its counsel, that the Contractor's required insurance pursuant to this Agreement shall remain in effect as called for in this Agreement after Final Payment and that such insurance shall not be canceled or allowed to expire until at least thirty (30) days prior written notice has been given to the Owner, if necessary.

37. **Release.** The acceptance by the Contractor of the Final Payment due under this Agreement, or of any Final Payment due upon any earlier termination of this Agreement, shall constitute a full and complete release of the Owner from any and all claims, demands and

causes of action of any nature whatsoever that the Contractor may have against the Owner in connection with this Agreement. The making of progress payments or the Final Payment by the Owner to the Contractor shall not constitute an acceptance of the Work of the Contractor or be deemed a release of the Contractor from any claims, demands or causes of action that the Owner may now, or at any time hereafter, have against the Contractor.

38. **Trust Funds.** It is understood and agreed to by the Parties that the Contractor and shall treat all monies received on account of the Work as trust funds for the benefit of the Owner, subcontractors, suppliers, and others providing work, labor, services and materials required under this Agreement and all applicable laws, rules and regulations, including the applicable lien law. The Contractor warrants and agrees that, subject to receipt of the required documentation from each individual subcontractor, the Contractor shall pay its subcontractors all undisputed amounts included in subcontractor's application for payment within seven (7) days of receipt of payment from the Owner (or sooner if required by law). The subcontractor's sole remedy for non-payment shall be against the Contractor and the Contractor shall defend, indemnify and hold the Owner harmless from and against any such claim by the subcontractors. The Contractor must notify the Owner in writing of any monies the Contractor intends to withhold from its subcontractors, suppliers, and vendors and provide reasonable explanation for so doing, which shall be subject to the Owner's reasonable approval.

39. **Withholding**. The Owner may withhold from any payment due or to become due to the Contractor, or may recover from the Contractor from any payment previously made, an amount sufficient to reimburse the Owner on account of correction or re-execution of those portions of the Work which are defective or have not been performed pursuant to this Agreement, or on account of any damage or claim caused by the Contractor provided Owner gives written notice and reasonable time to Contractor to first cure. No inspection, examination, or payment, in part or in full, shall relieve the Contractor of the obligation to perform the Work in accordance with the Contract Documents.

40. **Discharge of Liens**. The Contractor agrees that if any of its subcontractors performing the Work or furnishing materials, supplies, or equipment in connection with the Contractor's Work, or any of its sub-subcontractors or other person or entity claiming under or through such subcontractor, shall suffer, permit, file, or cause to be filed any lien against the Project with respect to the Work or any portion thereof, the Contractor, at its sole cost and expense, shall, within thirty (30) days after written notice from the Owner, cause such lien to be canceled and discharged of record by payment, bond, or otherwise, provided the Owner has made all payments required to be made hereunder with respect to such matters as are covered by such lien. If such lien is not canceled and discharged by the Contractor as required, the Owner shall have the right to cause such lien to be canceled and discharged and, in such event, all reasonable costs and expenses incurred by the Owner in connection therewith, including, without limitation, premiums for any bond furnished in connection with such cancellation and discharge and reasonable attorneys' fees and disbursements, shall be paid by the Contractor to the Owner on demand, or, at the option of the Owner, the Owner may retain, out of any payment then due or thereafter becoming due to the

Contractor under the terms of this Agreement, an amount sufficient to indemnify the Owner fully for any and all of the aforementioned costs and expenses.

41. **Refund of Payment**. If any payment made to the Contractor by the Owner shall include any unpaid obligations of the Contractor to a third party claimant, and if the Owner is thereafter compelled to pay such claimant after having already made payment therefor to the Contractor, then the Contractor, within ten (10) days after written notice thereof from the Owner to the Contractor, shall refund to the Owner an amount equal to the amount paid by the Owner to such claimant, up to the amount of the Contractor's unpaid obligations to such claimant, together with all direct costs and expenses incurred by the Owner in connection therewith, including, without limitation, reasonable attorneys' fees and disbursements.

42. **Warranties/Guarantees**. The Contractor warrants that (i) the Work performed under this Agreement conforms to the requirements contained in this Agreement and shall be free of any defects in equipment, material, or design furnished, or workmanship performed by the Contractor, or any subcontractor, supplier or manufacturer retained by it for purposes of performing the Work and Services contemplated by this Agreement for one (1) year; (ii) the materials and equipment provided in support of the Work performed are new unless otherwise specified in this Agreement; (iii) all materials stored off-site shall be bonded and/or insured; (iv) it has secured all rights, titles, licenses, and other authority which may be required to enable it to perform the Work; and (v) it shall perform all start-up operations for any equipment or materials incorporated into the Work in accordance with all manufacturer requirements and the requirements of this Agreement, and that it shall properly demonstrate to and initially train the Owner and any personnel designated by the Owner in the use, operation, care and maintenance of all such equipment and materials.

43. **Walk-Through and Warranty Report**. The Contractor shall participate with the Owner and the Project Team members, as applicable, in a walk-through of the Work no later than eleven (11) months after the Final Completion of the Work to prepare a list of warranty items, if any, to be repaired prior to the expiration of the warranty period, and cause the repair of said items at no cost to the Owner. Thirty (30) days prior to expiration of the twelve (12) month warranty period running from Final Completion, and in any event prior to the expiration of any one year warranty or guarantee provided in connection with the Work, the Owner shall inspect the Work for the purpose of providing a detailed report ("Warranty Report") setting forth all defective Work.

44. **Corrective Work**. Upon the Contractor's receipt of the Warranty Report, the Contractor shall correct or cause to be corrected the defective Work at no expense to the Owner and pursuant to the applicable workmanship and other warranties. Failure of the Owner or other Project team members to list defective Work on the Warranty Report shall not be deemed a waiver, and shall not relieve the Contractor of its responsibility to identify and correct all defective Work. Notwithstanding the foregoing, the Contractor shall not be responsible for any damage or defect caused by abuse, modifications made by others following the date of Final Completion, improper or insufficient maintenance, improper operation, or normal wear and tear. In the event the Owner is required to incur any expense relating to the

correction of any defective Work, all such direct expenses, including additional testing and inspections or reasonable attorneys' fees made necessary thereby, shall be the sole obligation of the Contractor, who shall reimburse the Owner upon demand. The Owner will provide written notice to the Contractor of any defective Work, which shall be cured by the Contractor in accordance with this Agreement.

45. **Warranty Term**. The Contractor's warranty shall continue in effect for the following term: (i) one (1) year from the Final Completion of the Work; or (ii) as to Work completed prior to Final Completion by virtue of any early termination of this Agreement, within one (1) year after the date of such termination. All warranties applicable to any equipment or fixtures that extend in excess of one year from Final Completion shall be assigned to the Owner for enforcement. The Parties acknowledge that there are no warranties, express or implied, other than those explicitly stated in this Agreement.

46. **Subcontractor Warranty**. The Contractor shall require each subcontractor to execute and deliver to the Owner a warranty of the Work performed by such subcontractor, in a form satisfactory to the Owner which shall equal the requirements of this Agreement and any additional requirements set forth in the Drawings and Specifications for the Work, and shall otherwise be in form and substance satisfactory to the Owner. Such warranty by a subcontractor shall be enforceable directly by the Owner against each such subcontractor and shall be in addition to any warranty provided by the Contractor herein.

47. **Supplier Warranty**. The Contractor shall obtain, if and when available, and provide to the Owner, warranties with respect to all applicable equipment and materials and personal property supplied with respect to the Work (and the labor costs to correct such Work) from the respective suppliers, at least as favorable as those generally supplied with respect to such equipment and materials of the suppliers thereof, which warranties shall be enforceable directly by the Owner against such suppliers (if Contractor has an opportunity to negotiate any such warranty) and shall be in addition to any warranty provided by the Contractor herein or by any subcontractor.

48. **Assignment of Warranty**. All negotiable warranties and guarantees required by this Agreement or obtained by the Contractor or its subcontractors or material suppliers/vendors as a result of performing the Work shall be assignable to the Owner or any successor in interest.

49. **Accounting Records**. The Contractor shall maintain clear and comprehensive records that confirm receipt of, check, and inventory all materials, equipment, and supplies which have been paid for by the Owner whether or not yet incorporated into the Work. The Contractor shall maintain full and detailed accounts, auditing records, and procedures as may be necessary to ensure proper financial management of the Work performed under this Agreement. The Owner's designated auditing agents and representatives shall, no more than quarterly, upon reasonable written notice to the Contractor, but in no event later than ten (10) days from the date of any such notice, be afforded access to, and shall have the right to review, inspect, photocopy and audit, all of the Contractor's electronic records, and all other records, books, correspondence, instructions, drawings, receipts, vouchers,

21

memoranda and similar data relating to the performance of the Work. The Contractor shall preserve all accounting records for a period of six (6) years after final payment to the Contractor hereunder.

50. **Ownership of Materials and Equipment**. As the Work progresses, title to each item of material or equipment shall vest in the Owner upon payment in full for such item by the Owner. Until delivery to the Project, the Contractor shall be responsible for insuring such materials and equipment and for obtaining any materials and equipment required to replace materials lost or damaged through damage, theft, vandalism, or other cause without cost or expense to the Owner. The Contractor warrants that (i) title to all materials and equipment incorporated in the Work or paid for by the Owner, including, without limitation, title to materials and equipment pre-purchased by the Contractor in accordance with the provisions of this Paragraph shall pass to the Owner free and clear of all liens, claims, security interests, and encumbrances of every kind after payment therefor; (ii) no materials or equipment covered by any Application for Payment shall be subject to an agreement under which an interest therein or an encumbrance thereon shall have been retained by the seller or otherwise imposed by or upon the Contractor, seller, or any other person after payment therefor; and (iii) any and all manufacturers' warranties and/or guarantees shall be in full force and effect as of the date of installation, testing, and acceptance by the Owner or the Contractor or upon being placed in storage at the Project or at an insured or bonded off-site storage location approved in writing by the Owner.

51. **Asbestos**. The Contractor shall not use, in connection with the Work any material containing asbestos as defined by the United States Environmental Protection Agency 40 CFR Ch.1 (7-1-00 Edition) Subpart M-National Emission Standard for Asbestos and the Occupational Safety and Health Administration, Part 1910: Occupational Safety and Health Standards, Subpart Z: Toxic and Hazardous Substances, Standard 1910.1001: Asbestos. If necessary, and as a duly issued Change Order, the Contractor shall be required to retain a licensed subcontractor to remove any existing asbestos.

52. **Hazardous Substances**. The Contractor shall not use, in connection with the Work any hazardous waste, toxic substance or related materials, including, without limitation, substances defined as "hazardous substances" or "toxic substances" in the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended, 42 U.S.C. See. 9061 et seq., Hazardous Materials Transportation Act, as amended, 49 U.S.C. Sec. 1802, and the Resource Conservation Act and Recovery Act, as amended, 42 U.S.C. Sec. 6901 et seq. ("Hazardous Materials"), in such manner as would violate any applicable laws or would cause any damage or a risk of any damage to the environment, or in such a manner as to leave any residue which could be hazardous to persons or property or cause liability to the Owner. In the event that the Contractor has knowledge of or should have reason to believe there may be Hazardous Materials on or about the Site, including, but not limited to asbestos, polychlorinated biphenyl (PCB), toxins and the like, the Contractor shall immediately report the contaminated condition or potential condition to the Owner and the Architect in writing. If necessary, and as a duly issued Change Order, the Contractor shall be required to retain a licensed subcontractor to remove any existing hazardous substances.

53. **Special Inspections and Testing**. If the Owner requires any part of the Work to be tested (to see if the Work complies with applicable law and/or this Agreement), the Contractor shall give the Owner notice of the readiness of such Work so that the Owner may schedule its inspectors to conduct such testing. If testing reveals a failure of the Work to comply with this Agreement, the Contractor shall bear all costs made necessary by such test, including compensation for the Owner's additional costs made necessary by such test, and the Contractor shall promptly correct such failure at no cost to the Owner. Whenever, in the opinion of the Owner, it is desirable to require special inspection or testing of the Work, the Owner shall have authority to order such special inspection or testing whether or not such Work is fully fabricated, installed, covered, or completed. The cost of such tests shall be borne by the Owner, except if it is determined that the Work fails to comply with this Agreement as set forth in this Paragraph.

54. **Searching For Defects**. With reasonable cause and at reasonable times, the Owner may instruct the Contractor to search for defects. Searching may include, but is not limited to, the following: (i) uncovering, dismantling, re-covering and re-erecting the Work; (ii) providing materials and equipment for testing and inspection to be performed by the Owner or other Project Team members; or (iii) performing tests not called for in the Work. To the extent it is determined that there are no defects in the Work, all reasonable costs associated with searching for defects and restoring the Work under this Section shall be borne by the Owner. This Section 54 shall survive for one (1) year following Substantial Completion.

55. **Correction of Defective Work.** The Contractor shall promptly correct any defective Work failing to conform to the requirements of this Agreement and whether or not the defective Work has been fully fabricated, installed, or completed. The Contractor and the subcontractors shall bear all reasonable and necessary costs of correcting such defective Work, including additional testing and inspections and compensation for services and expenses made necessary thereby. If the Contractor cannot timely correct the defective Work, the Contractor shall provide a plan to the Owner showing how it intends to remove, replace and/or correct the defective Work within a reasonable time.

56. **Owner's Right to Stop the Work.** If the Contractor fails to correct any defective Work which is not in accordance with the requirements of this Agreement or persistently fails to carry out the Work in accordance with this Agreement after written notice thereof, the Owner may order the Contractor to stop the Work, or any portion thereof, until the cause for such order has been eliminated.

57. **Owner's Right to Correct the Work**. If the Contractor defaults or neglects to carry out the Work in accordance with this Agreement or if the Contractor fails to commence and continue to correct any defective Work, the Owner may, without prejudice to other remedies the Owner may have, correct such defective Work and charge all reasonable costs associated therewith to the Contractor.

58. **Owner's Right to Accept Defective Work**. The Owner may, at its sole discretion, accept any defective Work. Such acceptance shall not entitle the Contractor to any increase of the Contract Price, but may entitle the Owner to issue a credit, in the form of a Change Order

complying with the provisions of Sections 30 and 31, if such defective Work is reasonably considered to be of lesser standard or quality from that specified in and by the Construction Documents.

59. **Intentionally Deleted**.

60. **Notice of Claim**. In the event of a claim or dispute arising out of the obligations called for in this Agreement, the Owner or the Contractor, may, by written notice with third-party delivery verification to the other, seek to resolve such claim or dispute as set forth in this Agreement.

61. **Meeting of Principals**. Within ten (10) days of a written notice of claim, a meeting shall take place between no less than one principal of both the Owner and the Contractor wherein an attempt shall be made in good faith to resolve the claim or dispute. If the disagreement is not resolved during this initial meeting, one or more additional meetings shall promptly be held until such time as the matter is resolved. If a principal of either the Owner or the Contractor in good faith declares an impasse between the Parties with regard to the claim or dispute, then the Claim(s) or disputes shall be resolved by litigation and recourse to the Supreme Court of the State of New York, County of New York.

62. **Interpretation of Construction Documents**. Clarification concerning issues relating to the interpretation of the Construction Documents, or changes thereto as they relate to the Work of the Contractor, shall be referred to the Architect for review or interpretation with respect to the performance and progress of the Work. The Architect shall render such interpretations with reasonable promptness. To the extent one party disputes the Architect's determination, such party may assert a claim pursuant to this Agreement. If a claim or dispute is referred to the Architect, the decisions/resolution proposed by the Architect shall have no binding effect on the Parties and the Architect has no authority to bind the Parties with respect to any claim or dispute.

63. **Owner's Right to Suspend Work**. The Owner may, at any time and for any good and sufficient reason, direct the Contractor to suspend the performance of the Work or any part thereof for a period of time. Such direction shall be in writing and shall specify the period during which the performance of the Work is to be suspended and the reasons therefor. The Contractor shall resume the performance of the Work upon the date specified in such direction or upon such other date as the Owner may thereafter specify in writing. The Contractor shall be entitled to a Change Order extending the target dates of Substantial Completion Date and/or Final Completion by the number of days the Work was delayed as a direct result of such suspension.

64. **Grounds for Termination for Cause**. The Contractor shall be deemed to have defaulted on its obligations hereunder, permitting the Owner to terminate the Contract for cause, by:

a. Persistent or repeated refusal or failure to supply enough properly skilled personnel to perform its required Work;

b.  Persistent disregard of laws, ordinances, or the rules, regulations, or orders of any public authority or governmental agency having jurisdiction over the Project;

c.  Failure to maintain the insurance required under this Agreement;

d.  Failure to satisfy its indemnification obligations required under this Agreement;

e.  Taking any action which would result in the Contractor being the subject of an insolvency proceeding[2];

f.  A material adverse change in Contractor's financial condition;

g.  Failure to meet the Project Budget upon the conclusion of excavation, SOE, and foundation; or

h.  Being in breach of a provision of this Agreement.

65. **Notice of Termination**. Upon the occurrence of any of the events set forth in Paragraph 64 herein, the Owner shall serve written notice pursuant to this Agreement upon the Contractor and provide a reasonable opportunity to cure. Upon receipt of such notice from the Owner, the Contractor shall have ten (10) days to cure the alleged default if the alleged default can reasonably be cured in ten (10) days and, if it cannot, then Contractor must at least initiate a good faith cure within ten (10) days of receipt of Owner's notice and diligently and continuously pursue such cure to completion (the "Cure Period"). In the event the Contractor shall not have cured said default within the Cure Period, the Parties agree the Owner may terminate this Agreement upon three (3) days written notice (the "Notice of Termination"). Upon curing, as determined by the Owner, the termination shall be revoked. Upon such termination, the Contractor shall immediately return all Project and Work-related documents and information (including, but not limited to, plans, memoranda, notes, minutes, drawings, sketches, electronic data, computer software, etc.) to the Owner.

66. **Owner's Rights Following Termination**. Upon the occurrence of a termination by the Owner of the Contractor for cause, and any time after the expiration of the Cure Period, at the Owner's option, exercised by written notice to the Contractor, the Owner shall (i) take title to any or all of the Contractor's materials and Work in progress, and both shall vest in the Owner who may take possession of and utilize the same for completion of the Work, provided that the Contractor is paid for all undisputed Work provided to the date of termination; and (ii) have the right, in addition to all other rights and remedies, to complete or cause the Work to be completed by such reasonable means and in such manner, by

---

[2] The term "insolvency proceeding" as used herein shall include the filing of a petition for relief under Chapters 7 and 11 of Title 11 of the United States Code by the Contractor or the consent, acquiescence or taking of any action by the Contractor, or the filing by or against the Contractor of any petition or action, looking to or seeking any reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under any other present or future Federal or State statute, law or regulation; or the appointment, with or without the consent of the Contractor or any trustee, custodian, receiver or liquidator of the Contractor or any property or assets of the Contractor, or the Contractor's making of an assignment for the benefit of creditors or its inability to pay its debts as they become due.

contract or otherwise, as the Owner deems advisable, subject to the terms and conditions of the payment and performance bonds required hereunder and any other bonds obtained hereunder to assure completion of the Work or any portion thereof. In the event of a termination for cause, the following shall also occur:

a. Subcontracts entered into by the Contractor in connection with the Work shall, at the Owner's option, and pursuant to the terms and conditions agreed to in writing by the Owner, be assigned to the Owner or such other contractor as the Owner may direct. Such assignment shall not relieve the Contractor from its liability to such subcontractor for any other monies due, or to the Owner, for claims arising in connection with those portions of the Work which shall have been performed prior to the date of such assignment.

b. If it shall be determined that a termination for cause was wrongful or unjustified, such termination shall be deemed to be a termination for the convenience of the Owner under this Agreement.

67. **Termination for Convenience**. The Owner, at any time, may terminate this Agreement for its own convenience. Such termination shall be effected by delivering to the Contractor a Notice of Termination specifying the date upon which such termination shall become effective and any specific portion of the Work to be completed by the Contractor prior to such termination. If it is ever determined that the Owner improperly terminated Contractor for cause, such termination shall be considered a termination for convenience under this Paragraph.

68. **Contractor's Obligations Following Termination**. Upon receipt of a Notice of Termination, the Contractor shall:

a. Stop all Work under this Agreement on the date, and to the extent specified, in the Notice of Termination, and not enter into any further subcontracts;

b. Unless directed otherwise by the Owner, terminate all subcontracts entered into by the Contractor in connection with the Work to the extent that they relate to portions of the Work to be performed subsequent to the date set forth in the Notice of Termination or, at the Owner's option, assign to the Owner, or such other contractor as the Owner may direct, all of the right, title, and interest of the Contractor under any or all subcontracts entered into by the Contractor in connection with the Work. Such assignment shall not relieve the Contractor from its liability to such subcontractor for any other monies due, or to the Owner, for claims arising in connection with those portions of the Work which shall have been performed prior to the date of such assignment;

c. Transfer, to the extent not already vested in the Owner, title to the Owner for all fabricated or unfabricated parts, Work in process, completed Work, supplies, and other material and equipment produced as a part of, or acquired in connection with the performance of, the Work terminated by such Notice of Termination and the completed or partially completed Drawings and Specifications and other submittals, information,

and other property which, if this Agreement had not been terminated, would have been required to be furnished to the Owner;

    d.  Complete performance of such part of the Work as shall have been specified in the Notice of Termination to be completed by the Contractor prior to the effective termination date; and

    e.  Prior to the effective termination date, take such action as may be necessary, or as the Owner may direct, for the reasonable protection, security, and preservation of the Site and the Work.

69. **Payment Following Termination**. In the event of a termination of this Agreement for convenience, and subject to the Owner's right to withhold payments to the extent permitted under the terms of this Agreement, the Contractor shall be paid by the Owner for the actual costs incurred by the Contractor in the performance of its Work over the course of this Agreement up to the date of termination, and for all materials, supplies, and equipment incorporated in the Project and/or stored at the Site or at off-Site storage locations as well as profit and overhead arising from or related to Work performed in accordance with this Agreement up to the date of termination. The Contractor shall not be entitled to recover anticipated profits on account of its fee and/or general conditions costs or the anticipated profits of subcontractors for portions of the Work unperformed or for materials or equipment unfurnished, nor for reimbursement for losses arising out of matters covered by insurance; Contractor shall, however, be entitled to recover all costs of any and all additional Project insurance purchased for the Work or other premium increases associated directly with the Work. No additional Project insurance shall be purchased without the Owner's prior written approval. The Contractor shall further disclose to the Owner any increased premium charges promptly upon learning of such increase.

70. **Suspension and Termination by Contractor**. If Owner shall fail to make any timely payment as required hereunder, Contractor may, upon five (5) days written notice to Owner and opportunity to cure, suspend performance until payment in full is made. If, following such five (5) day cure period Owner has not so cured, Contractor may, upon an additional three (3) days written notice to Owner and opportunity to cure, terminate this Agreement and pursue all rights at law and under this Agreement to collect payment for all Work performed to date, including reasonable overhead and profit for such completed Work and anticipated profit on any uncompleted Work.

71. **Liability**. No personal liability shall accrue hereunder against any individual, partner, officer, director, shareholder, representative, employee, trustee, fiduciary or principal (disclosed or undisclosed) of the Owner, the Contractor, or any Additional Insured identified in this Agreement.

72. **Confidentiality**. The Contractor acknowledges that it or its employees may, in the course of performing its responsibilities under this Agreement, be exposed to or acquire information which is proprietary to or confidential to the Owner, its affiliated companies or third parties to whom the Owner has a duty of confidentiality. Any and all information

of any form obtained by the Contractor or its employees in the performance of this Agreement shall be deemed to be confidential and proprietary information (the "Confidential Information"). The Contractor agrees to hold such information in strict confidence and not to disclose such information to third parties or to use such information for any purpose whatsoever other than the provision of Services as contemplated by this Agreement and to advise each of its employees who may be exposed to such proprietary and confidential information of their obligations to keep such information confidential.

a.   If any person or entity (other than the Architect, an insurer, a subcontractor of any tier, a lender or a supplier for this Project) seeks from the Contractor any information concerning the Project, the Contractor shall promptly notify the Owner. If requested by the Owner, the Contractor and any Key Personnel shall sign separate confidentiality agreements. The Contractor shall cause its subcontractors and any other person or entity performing any portion of the Work to represent and warrant to the Owner the items set forth in this Section and, if requested by the Owner, to obtain and deliver to the Owner a similar agreement regarding confidentiality from all of its subcontractors.

b.   Confidential Information shall not include information which is: (1) in or becomes part of the public domain other than by disclosure by the Contractor in violation of this Agreement; (2) demonstrably known to the Contractor previously, without a duty of confidentiality; (3) independently developed by the Contractor, outside of this Agreement; or (4) which is required to be disclosed by law, statute or regulation.

73.   **Public Disclosure and Advertising**. The Contractor shall not divulge information concerning the Work or Project to anyone (including, without limitation, information regarding any applications for permits and/or variances) without the Owner's prior written consent, except as may be required for the timely completion of the Work according to the Project Schedule. The Contractor shall obtain and deliver to the Owner a similar agreement from all subcontractors. The Owner reserves the right to release all information with respect to the Work, other than the operations of the Contractor and the subcontractors, in such form, at such times and in such manner as the Owner, in its sole discretion, determines. No signs advertising the Work to be performed, or identifying any person, firm, or entity concerned with the Work shall be allowed at the Site unless approved, in advance in writing by the Owner, which approval shall lie within the Owner's sole and exclusive discretion.

74.   **Assignment**. The Contractor shall not assign this Agreement or the performance of all or any portion of its obligations hereunder without the prior written consent of the Owner, which consent may be given or withheld in the Owner's sole and exclusive discretion. This Agreement shall be assignable by the Owner without the consent of the Contractor. The Owner agrees that upon any such assignment, it shall remain obligated to pay the Contractor pursuant to the terms of this Agreement up to the date of such assignment. If the Owner shall assign this Agreement, the Contractor covenants and agrees that it shall deal with such assignee in the place and stead of the Owner and that it shall perform all of its obligations under this Agreement and complete the Work in the manner required by this Agreement. The parties covenant and agree that any assignee of Owner or Contractor may

28

enforce the rights of its assignor and the obligations of the other party hereunder with the same force and effect as if enforced by the assignor.

75. **No Joint Venture**. Nothing contained in this Agreement shall be construed to mean that the Contractor and the Owner are joint venturers or partners, it being expressly understood and agreed by the Parties hereto that the Contractor, in performing its obligations under this Agreement, shall be deemed an independent contractor and not an agent or employee of the Owner. Contractor shall not have any authority, and shall not hold itself out as having any authority, to act on behalf of the Owner or to bind the Owner to an agreement with a third party.

76. **Third Party Relationships.** Nothing contained in this Agreement shall create a contractual relationship with, an obligation to, or cause of action in favor of any third party against either the Owner or the Contractor.

77. **Employment**. The Parties shall not be allowed to retain or hire the other's employees during the Project and for a period of three (3) years following the Contractor's completion of all of its duties under this Agreement, unless the Owner or the Contractor, as the case may be, provides written approval to the employee allowing that employee to work with and for the other Party.

78. **Third Party Contracts**. No principal, officer, shareholder, family member, employee, agent, employee or consultant of the Contractor shall become, directly or indirectly, interested personally in the Project, and no such personnel shall receive or accept, directly or indirectly, any gratuity or other benefit on account of any such contracts or agreements (it being understood that all such benefits shall accrue solely to the Owner).

79. **No Waiver**. The failure of the Owner to insist upon the strict performance of any provision of this Agreement, or the failure of the Owner to exercise any right, option, or remedy hereby reserved, shall not be construed as a future waiver of any such provision, right, option, or remedy or as a waiver of a subsequent breach thereof. The consent or approval by the Owner of any act by the Contractor requiring the Owner's consent or approval shall not be construed to waive or render unnecessary the requirement for the Owner's consent or approval of any subsequent similar act by the Contractor. The payment by the Owner of any amount due hereunder with or without the knowledge of a breach of any provision of this Agreement shall not be deemed a waiver to seek redress for such breach. No provision of this Agreement shall be deemed to have been waived unless such waiver shall be in writing signed by the party to be charged.

80. **Severability**. If any provision of this Agreement is invalid or unenforceable as against any person, party or under certain circumstances, the remainder of this Agreement and the applicability of such provision to other persons, parties, or circumstances shall not be affected thereby. Each provision of this Agreement shall, except as otherwise herein provided, be valid and enforced to the fullest extent permitted by law.

81. **Ownership and Copyright of Documents.** All documents prepared and furnished by the Contractor or any subcontractor in connection with the Work to be performed pursuant to this Agreement, including, without limitation, all Drawings, Specifications, sketches, submittals, and as-built plans, shall at all times be and remain the property of the Owner. The Contractor shall obtain from the suppliers, vendors, and subcontractors: equipment brochures, warranties, instruction manuals, service contracts, certificates of compliance and other agreements and instruments as required pursuant to this Agreement.

82. **Right of Access**. The Owner reserves for itself, its Project team, and authorized third parties the right of reasonable access to any part of the Work at any time, including for the purpose of observing or testing or to install other work either with its own forces or with other contractors. Such access shall be reasonably coordinated with the Contractor, and is not to be construed to mean partial occupancy by the Owner. Moreover, Owner shall have and retain all liability and responsibility for any loss, damages and claims, including reasonable attorneys' fees and costs, arising out of such access.

83. **No Promotion.** The Contractor agrees that it shall not, without the prior written consent of the Owner in each instance, (i) use in advertising, publicity, or otherwise the name of the Owner, or any affiliate of the Owner, or any partner or employee of the Owner, nor any trade name, trademark, trade device, service mark, symbol or any abbreviation, contraction or simulation thereof owned by the Owner or its affiliates; (ii) take or cause to be taken any photographs of the Work or the Site for dissemination to the public; or (iii) represent, directly or indirectly, that any product or any service provided by the Contractor has been approved or endorsed by the Owner. This Paragraph shall survive the termination of this Agreement.

84. **Modification of Agreement.** The Parties acknowledge and agree that the terms of this Agreement cannot be modified orally and without the written consent and approval of both Parties.

85. **Representation by Counsel.** The Parties acknowledge and represent that they had an opportunity to seek the advice of counsel as relating to the terms of this Agreement.

86. **Equal Employment Opportunity.** During the performance of the services called for hereunder, the Contractor shall not discriminate against any employee or applicant for employment because of race, color, religion, sex, age, national origin or ancestry. The Contractor shall take affirmative action to ensure that applicants are employed, and that employees are treated during employment, without regard to their race, color, religion, sex, age, national origin or ancestry. The Contractor shall post in conspicuous places, available to employees and applicants for employment, notices provided by the appropriate agency having jurisdiction over equal opportunity employment. The Contractor shall include the foregoing provisions of this Paragraph in every agreement with its subcontractors so that such provisions shall be binding upon each subcontractor providing work, labor or materials to the Project.

87. **Immigration and Citizenship**. It is understood, and agreed by the Contractor that all employees of the Contractor and its subcontractors, including all of its subcontractors or sub-subcontractors, comply with all current citizenship and immigration laws. It is further understood and agreed by the Contractor that the Contractor will incorporate the provisions of this Paragraph into all agreements with its subcontractors.

88. **Consent**. In the event that the Owner's consent or approval is required under this Agreement, the Owner may withhold such consent or approval in its sole discretion, unless otherwise specified herein.

89. **Attorneys Fees**. If any litigation is brought by either party against the other either to enforce the rights of any party hereto or to clarify rights and obligations hereunder, the substantially prevailing party shall be entitled to recover from the other party thereto the reasonable costs and expenses, including reasonable attorneys' fees and costs, of such proceeding.

90. **Damages**. Notwithstanding any other provision herein, it is expressly understood and agreed that neither party shall have any liability for consequential, special, punitive or treble damages with respect to any of the agreements or covenants of this Agreement.

THE PARTIES AGREE THAT THEY DO AND SHALL WAIVE AND FOREGO ALL RIGHT TO TRIAL BY JURY IN ANY LITIGATION, ACTION, PROCEEDING OR COUNTERCLAIM BROUGHT BY EITHER OF THE PARTIES HERETO.

**\*SIGNATURE PAGE FOLLOWS\***

**IN WITNESS WHEREOF**, this Agreement is hereby executed by the Owner and the Contractor as of the Effective Date.

**GLEN and ALISON KUNOFSKY**              **ABR BUILDERS LLC**

                                          By:
                                          Name:
_____        Title:
Signature                                 Address:


_____        _____
Signature                                 Signature


**EXHIBITS**

**EXHIBIT A – <u>CONSTRUCTION DOCUMENTS</u>**
**EXHIBIT B – <u>ESTIMATE AND SCHEDULE OF VALUES</u>**
**EXHIBIT C - <u>HOURLY RATES SCHEDULE</u>**
**EXHIBIT D - <u>PARTIAL LIEN WAIVER</u>**
**EXHIBIT E - <u>FINAL LIEN WAIVER</u>**
**EXHIBIT F - <u>INSURANCE</u>**
**EXHIBIT G - <u>DEFINITIONS</u>**

**EXHIBIT B**
**(AMENDMENT)**

# FIRST AMENDMENT TO AGREEMENT FOR
## GENERAL CONTRACTING SERVICES

This First Amendment to the General Contractor Agreement, effective as of January __, 2017 (the "Agreement"), between Glen and Alison Kunofsky ("Owner") and ABR Builders LLC ("Contractor"), is entered into as of March 26, 2019 (the "First Amendment").

WHEREAS, pursuant to the Agreement, Contractor is in the process of renovating Owner's townhouse located at 270 West 73rd Street, New York, New York 10023;

WHEREAS, pursuant to the Agreement, including Paragraph 4 of Part I, Contractor is required to perform its Work[1] in strict accordance with the Project Schedule, as may be amended, time being of the essence;

WHEREAS, the Parties have agreed upon a modified Project Schedule, as set forth herein;

WHEREAS, the parties have agreed upon certain modified terms and conditions to the Agreement, as set forth herein; and

WHEREAS, Contractor and Owner have agreed to amend the Agreement to memorialize the foregoing.

NOW, THEREFORE, in consideration of the foregoing and other good and valuable consideration, which the parties mutually acknowledge and accept, the parties hereby agree that:

1. Contractor shall strictly comply with a modified Project Schedule that includes key milestone dates as follows:

   a. The date of Substantial Completion of the Contractor's Work shall be on or before May 1, 2019.

   b. The date of Final Completion of the Contractor's Work shall be within sixty (60) days after Substantial Completion.

2. In the event Contractor fails to comply with the modified Project Schedule, as set forth herein, the Contractor shall be subject to the following: (i) payment of liquidated damages to the Owner in the amount of $1,500 for each day the Project is delayed beyond the modified Project Schedule; and (ii) Owner's right, in its sole election, to automatically and immediately terminate Contractor for cause, without any right to cure, under the Agreement, charge Contractor for the difference between the balance of the Contract Price and the cost to complete the Work with a new contractor, and recover all attendant liquidated damages and legal and professional costs. *GAS INSPECTION*

   *WLK ON MAY 8TH, 2019*

   a. The Parties mutually acknowledge and agree that liquidated damages shall continue to accrue, notwithstanding any termination by Owner of the Agreement, for every day the Project is not Substantially Complete or Finally Complete beyond the modified Project Schedule.

---

[1] Unless defined herein, all capitalized terms shall have the meaning set forth in the Agreement.

b.  The Parties further acknowledge and agree that the liquidated damages shall not be deemed a penalty, but rather represent compensation for damages that Owner would suffer in the event of a delay in meeting the modified Project Schedule.

c.  Notwithstanding the foregoing, if the liquidated damages set forth above are unenforceable for any reason, Owner shall be entitled to receive the actual damages that it sustains as a result of Contractor's failure to meet the modified Project Schedule. The following categories of expenses, without limitation, shall be considered direct (rather than consequential) damages: actual costs to complete and/or cure, maintenance costs, real estate taxes, cost of utilities and staffing, insurance premiums, Lender interest and fees, attorneys' fees, and fees charged by the Design Team.

3.  In addition to Contractor's obligations under Paragraph 8 of Part II of the Agreement, Contractor shall:

a.  Within three (3) days of execution of this First Amendment, provide Owner with a comprehensive list all materials, tools, equipment and supplies over [$_____] remaining to be ordered, delivered, and/or installed with the applicable lead times for purchase.

b.  Submit a weekly schedule each Friday until Final Completion of (i) all Work to be completed; (ii) a list of subcontractors and employees that will be on the Site; and (iii) Work to be completed by each subcontractor or employee.

c.  Submit its invoices and lien releases for all work requiring payment each Friday.

d.  Subject to Contractor's compliance with the foregoing, Owner shall review each invoice and issue payment to Contractor by Wednesday of the following week.

e.  Any deviation by Contractor to the foregoing submittal schedule shall be deemed a material breach of this Agreement and Owner shall be entitled to terminate the Agreement for cause at any time and without a right to cure, charge Contractor for the difference between the balance of the Contract Price and the cost to complete the Work with a new contractor, and recover all liquidated damages and attendant legal and professional costs.

4.  The definition of Substantial Completion, as set forth in Exhibit G, shall be modified and replaced as follows:

The Work shall be deemed to be substantially complete when (i) the Work has been completed in accordance with the terms of the Contract Documents except for Punch List items, (ii) the Architect delivers a certificate to Owner certifying completion of the Work in accordance with the terms of the Contract Documents, and (iii) all Work requiring DOB "sign-off" is complete and ready for inspection.

5.  Contractor acknowledges and agrees that Owner reserves the right and intends to issue certain payments directly to Contractor's subcontractors pursuant to Paragraph 34 of Part II of the Agreement and deduct the amount of such payments from the Contract Price. Further, Contractor acknowledges responsibility for any unpaid storage fees for any items purchased by Owner since the commencement date of Contractor's Work.

6.  Contractor acknowledges and accepts its obligations under Paragraph 12 of Part II of the Agreement, and as such, shall, subject to Owner's review and approval, complete all

remediation and restoration work related to or arising out of the water infiltration in the basement of the Site, including all labor and materials (including but limited to curing the damaged doors). Contractor shall further be responsible for all costs and damages incurred by Owner related to the water infiltration into the Site and shall promptly address any claim with respect to mold prevention and water infiltration. Notwithstanding the Warranty Term in Paragraph 45 of Part II of the Agreement, Contractor's warranty with respect to its remediation of the basement and/or arising out of the water infiltration damage shall continue for a term of five (5) years from Final Completion of the Work or any early termination of this Agreement.

7. To the extent Owner advances any Retainage to Contractor to complete any portion of the Work, Bolek Ryzinski (Ryzinski) personally guarantees the completion of the attendant Work or repayment of the advanced Retainage, at Owner's sole election. In other words, any advanced Retainage shall be deemed a loan against the Work, secured by Ryzinski's personal guarantee. Owner shall be entitled to recover all costs, including collections costs and attorneys' fees, to enforce this personal guarantee.

8. Contractor represents and warrants that the provisions of Exhibit F of the Agreement remain in full force and effect, including but not limited, the requirement to hold and maintain Workers' Compensation and employer's liability insurance until Final Completion.

9. Contractor shall comply with all labor, employee, and tax obligations with respect to its employees and subcontractors, and shall defend, indemnify, and hold harmless Owner from and against any and all claims, demands, actions, lawsuits, liability, judgments, damages, costs, and expenses, including reasonable attorneys' fees, arising out of or related to such employee and independent contractor labor and employment obligations.

10. The parties mutually acknowledge and accept that they enter into this First Amendment freely and with full knowledge of the scope and effect herein, and each had an opportunity to consult with counsel before signing.

11. All other provisions of the Agreement shall remain in full force and effect. The document, dated and signed March 25, 2019, by the Parties, shall be deemed incorporated into and read together with this First Amendment such that they are read favorably to Owner.

12. This First Amendment may be executed in counterparts and a signed copy, transmitted by email or fax, shall be deemed an original for purposes of execution.

13. Owner shall be entitled to recovery of all costs and expenses, including attorneys' fees, against Contractor to enforce the Agreement and this First Amendment.


WHEREFORE, the parties have executed this First Amendment as of the date written above.


*SIGNATURE PAGE FOLLOWS*

**GLEN AND ALISON KUNOFSKY**

By:

Name: Glen Kunofsky

Title: Authorized Signature

Address: 176 W 73 Apt 11B
NY, NY 10023

_____
Signature

**ABER BUILDERS LLC**

By: ABR EMILSENS

Name: BOLESLAV RYZINSKI

Title: MEMBER

Address: 39 W 38 St.
NY. NY 10016

_____
Signature

PERSONAL GUARANTY BY BOLEK RYZINSKI

New York City
26th Day of March, 2019

Patrycja Roman

PATRYCJA A. ROMAN
NOTARY PUBLIC-STATE OF NEW YORK
No. 01RO6361459
Qualified In New York County
My Commission Expires 07-10-2021

EXHIBIT A

MODIFIED PROJECT SCHEDULE

This document shall be treated as an amendment to the contract between ABR Builders LLC , G270 W. 73rd Owner LLC and A270 W. 73rd Owner LLC. All payments that will be made to subcontractors directly will be credited against the original contract price. ABR Builders LLC and Bolek Ryzinski personally shall hold G270 W. 73rd Owner LLC and A270W. 73rd Owner LLC harmless from any claims of any sort from any of the subcontractors related to work done at 270 W. 73rd St. ABR Builders LLC shall be responsible for overseeing and completion of all work for any monies paid directly to subcontractors.

Signed 3/25/19 by:

3/25/19

A270 W. 73rd Owner LLC

3/25/19

G270 W. 73rd Owner LLC

3/25/19

ABR Builders, LLC

3/25/19 .

Bolek Ryzinski

**EXHIBIT C**
**(ASSIGNMENT)**

## ASSIGNMENT AND ASSUMPTION AGREEMENT

This **ASSIGNMENT AND ASSUMPTION AGREEMENT**, (the "Assignment"), is deemed effective as of March 30, 2017 (the "Effective Date"), by and between Glen and Alison Kunofsky ("Assignor"), and G270 W. 73rd Owner LLC and A270 W. 73rd Owner LLC ("Assignee").

### WITNESSETH:

**WHEREAS**, in or about January 2017, Assignor entered into a General Contractor Agreement with ABR Builders LLC ("ABR"), as amended by the First Amendment on or about March 26, 2019 (collectively, the "Agreement"), to oversee and perform certain renovations to Assignor's townhouse located at 270 West 73rd Street, New York, New York 10023 (the "Townhouse" or "Project");

**WHEREAS**, prior to the Effective Date, Assignor transferred its ownership interest in the Townhouse to Assignee, and therefore wishes to assign the Agreement to Assignee as of the Effective Date;

**WHEREAS**, Assignor has agreed to assign all of its rights, interest, and obligations under the Agreement to Assignee; and

**WHEREAS**, Assignee wishes to accept and assume all of the rights, interest, and obligations of Assignor under the Agreement as set forth herein.

**NOW THEREFORE**, in consideration of the mutual covenants and promises herein contained, and other good and valuable consideration, the parties hereto agree as follows:

1. Assignor represents that it has full authority to assign, transfer, and convey all of its rights, interest, and obligations under the Agreement to Assignee.

2. Assignor hereby assigns, transfers, and conveys to Assignee all of Assignor's rights, interest, and obligations under the Agreement.

3. Assignee hereby accepts and assumes the foregoing Assignment.

4. ABR hereby accepts the Assignment and releases any and all claims or potential claims against Assignor as of the Effective Date of this Assignment.

5. Notwithstanding that the First Amendment is entered into between Assignor and ABR, this Assignment is intended to correctly name the ownership entity of the Townhouse and retroactively acknowledge and assign the Agreement and First Amendment to Assignee, such that the Agreement and First Amendment shall be deemed between Assignee and ABR as of the Effective Date.

6. This Assignment and all matters pertaining hereto shall be governed by

and construed under the laws of the State of New York.

7. Any change or modification to this Assignment shall be invalid unless in writing executed by both parties.

8. Except as set forth herein, the Agreement shall remain unchanged and in full force and effect.

9. This Assignment may be executed in counterparts and a signed copy, transmitted by email or fax, shall be deemed an original for purposes of execution.

WHEREFORE, the parties have executed this Amendment as of the date written above.

*SIGNATURE PAGE FOLLOWS*

Glen and Alison Kunofsky

G270 W. 73rd Owner LLC and A270 W. 73rd Owner LLC

By: _____ Asignee
Name: _____
Title: _____
Address: 270 West 73d St. NY NY 10023

_____
Signature

_____
Signature

ACKNOWLEDGED AND AGREED TO BY:

ABR Builders LLC

By: _____
Name: _____ MEMBER
Title:
Address: 39 W 30TH
         NYC NY 10016

_____
Signature

**EXHIBIT D**
**(PICTURES OF CURRENT STATE OF PROJECT)**



INSIDE GARDEN - LEVEL
ENTRY
(ON WAY TO
KITCHEN -
INSIDE
DOOR)







CELLAR

ONE OF
MY SINKS!







# NYC
## Buildings

**EXPIRED PERMIT**

## Work Permit Department of Buildings

Permit Number: *122779733-01-AL*

Issued: 04/05/2018        Expires: 04/01/20..
Issued to: *BOLESLAV RYZINSKI*
Business: *ABR BUILDERS LLC*
Contractor No: *GC-608584*

Address: *MANHATTAN    270 WEST 73 STREET*

Description of Work:
*ALTERATION TYPE 1 - CONVERT MULTIPLE DWELLING IN TO A SINGLE FAMILY HOME. ADD EXTENSION AT REAR AND ADD ROOF...  ...CERTIFICATE OF OCCUPANCY WILL BE OBTAINED.*

**EXPIRED**

*Review is requested under Building Code: 2014*        SITE FILL: NOT APPLICABLE

To see a Zoning Diagram (ZD1) or to challenge a zoning approval filed as part of a New Building application or Alteration application filed after 7/13/2009, please use "My Community" on the Buildings Department web site at www.nyc.gov/buildings.

Emergency Telephone Day or Night: 311

Borough Commissioner:                    Commissioner of Buildings:

Tampering with or knowingly making a false entry in or falsely altering this permit is a crime that is punishable by a fine, imprisonment or both.

OP-95A (2/10)











OPEN
ELEVATOR
SHAFT



**EXHIBIT E**
**(REJECTION LETTER)**



**ABR BUILDERS LLC**

39 West 38th Street, Suite 1100W, New York NY 10018

April 5th, 2019

Re: ABR BUILDERS LLC work at 270 West 73rd street, New York, New York 10023

Dear Alison & Glen Kunofsky,

We are a general contractor with respect to the premises owned by you and located at 270 West 73rd street, New York, New York, pursuant to a construction contract dated December twenty-second, 2016 between your company and our company.

Please be advised that on April 4th, 2019, our company filed a petition under chapter 11 of the Bankruptcy Code. We have determined that we cannot continue our operations and this construction project. We have determined to reject the Executory Agreement & the First Amendment to Agreement for General Contracting Services pursuant to provisions of paragraph #365 of the Bankruptcy Code. You will be receiving within the near future a copy of our papers to the Bankruptcy Court seeking this relief.

We are notifying you of our determination because we do not wish to impede you or interfere in you completing the project.