RUBIN LLC
Paul A. Rubin
Hanh V. Huynh
345 Seventh Avenue, 21st Floor
New York, New York 10001
Tel:  212.390.8054
Fax: 212.390.8064
prubin@rubinlawllc.com
hhuynh@rubinlawllc.com

*Counsel for Glen and Alison Kunofsky*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

| | : | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| ABR BUILDERS LLC, | : | Case No.:  19-11041 (SHL) |
| | : | |
| Debtor. | : | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**OBJECTION OF GLEN AND ALISON KUNOFSKY
TO APPROVAL OF DISCLOSURE STATEMENT**

Glen and Alison Kunofsky (the "Kunofskys") file this objection (the "Objection") to approval of the *Disclosure Statement dated October 3, 2019* (the "Disclosure Statement") [ECF No. 45] filed by ABR Builders LLC (the "Debtor") relating to the *Debtor's Plan of Reorganization dated October 2, 2019* (as amended on October 8, 2019, the "Plan").  In support of this Objection, the Kunofskys respectfully represent as follows:

**BACKGROUND**

1.  The Kunofskys, through their entities G270 W. 73rd Owner LLC and A270 W. 73rd Owner LLC (collectively, the "Owners"), are the owners of a townhouse located at 270 West 73rd Street, New York, New York (the "Property").

2.  In January 2017, the Kunofskys entered into that certain *General Contractor Agreement* dated as of January 2017 (as amended, the "Contract") with the Debtor, pursuant to

which the Debtor would act as the general contractor ("GC") in connection with a gut renovation project of the Property (the "Project"). Under the Contract, the Debtor was to commence work on the Project beginning February 2017, with substantial completion of the renovation to occur on or before April 6, 2018.

3.  The Debtor's role as GC for the Project was mired by missed milestones, defective work, and damage to the Property. As a result of the Debtor's failure to complete the Project by the agreed-upon date, the Kunofskys, the Debtor and the Debtor's principal, Bolek Ryzinski (as guarantor) ("Ryzinksi," or the "Guarantor") entered into a *First Amendment to Agreement for General Contractor Services* dated March 26, 2019 (the "Amendment"). The Contract and the Amendment were assigned from the Kunofskys to the Owners under that certain *Assignment and Assumption Agreement* (the "Assignment"), which Assignment was acknowledged and agreed to by the Debtor.

4.  Pursuant to the Amendment, among other things, (i) the Project schedule was modified to require substantial completion by May 1, 2019, (ii) the Debtor agreed to pay certain liquidated damages in the event of its failure to comply with the modified schedule, (iii) the Debtor agreed to additional protocols for status updates and invoicing, (iv) the Debtor acknowledged and accepted its obligation to remediate the damages to the Property caused by the water infiltration in the basement of the Property, and (v) Ryzinski agreed to personally guarantee (the "Guarantee") repayment of retainages made by the Kunofskys to the extent that any portion of the work on the Project was not completed by the Debtor.

5.  Promptly after the execution of the Amendment, and in reliance on the Debtor's and the Guarantor's assurances that the Project could be completed under the new timetable, the Kunofskys paid approximately $227,000.00 directly to the Debtor's subcontractors and vendors,

who were otherwise unwilling to continue to work on the Project.  The Debtor now admits in its Disclosure Statement that it had "lost its insurance coverage with the New York State Insurance Fund ("NYSIF") resulting in the inability to continue to render contracting work."  Disclosure Statement ¶ 14.  Despite the Debtor's and the Guarantor's knowledge that the Debtor would be unable to perform under the Contract or the Amendment, the Debtor and the Guarantor induced the Kunofskys to pay hundreds of thousands of dollars to subcontractors and vendors pursuant to the Amendment on the promise that the Project would be substantially completed by May 1, 2019.  As it turns out, the Debtor was not even able to legally operate until July 15, 2019.  *See* Disclosure Statement ¶ 15.

6.    Just a week after the Amendment was executed and the Kunofskys had paid $227,000.00 directly to subcontractors and vendors, on April 4, 2019 (the "Petition Date"), the Debtor commenced the above-captioned chapter 11 case in this Court.

7.    On April 25, 2019, the Kunofskys filed the *Motion of Glen and Alison Kunofsky to Compel the Debtor to Reject General Contractor Agreement as Amended* (the "Motion to Compel Rejection") [ECF No. 14].  The Motion to Compel Rejection sought to compel the Debtor to immediately reject the Contract.  On May 6, 2019, the Court entered the *Consent Order Rejecting General Contractor Agreement, as Amended* (the "Rejection Order") [ECF No. 19], pursuant to which the Contract was rejected effective as of the Petition Date.[1]

8.    On July 2, 2019, the Court entered an order establishing August 12, 2019, as the deadline for filing proofs of claim against the Debtor.

---

[1] The Disclosure Statement inaccurately describes the Motion to Compel Rejection as seeking to compel the Debtor to assume or reject the Contract.  *See* Disclosure Statement ¶ 17.  By its own admission, the Debtor "was literally out of business at the time it filed," and did not recommence its operations until July 15, 2019.  *See id.* at ¶¶ 13, 15.  There is no possibility that the Debtor could have assumed the Contract and the Kunofskys did not seek to compel the Debtor to do so.

3

9. On August 12, 2019, the Kunofskys (through the Owners) filed a proof of claim, designated as claim number 66 on the Debtor's claims register, asserting a claim against the Debtor in the amount of $816,683.58 for damages caused by the Debtor's breaches of the Contract. According to the Disclosure Statement, creditors have filed claims totaling $13,458,000 against the Debtor, of which the Debtor believes at least $9,750,000 are litigation claims.

10. On October 3, 2019, the Debtor filed the Disclosure Statement. On October 8, 2019, the Debtor filed a corrected Plan.

11. The Plan proposes to pay the claim of the Debtor's secured lender in the amount of $128,559.75 in full; to pay priority wage claims in the aggregate amount of $80,707.58 in full over four years; to pay priority claims of governmental units in the aggregate amount of $426,272.18 in full over four years; and to pay general unsecured claims in the aggregate amount of approximately $4,000,000 (which does not include any breach of contract and litigation claims) their pro rata share of proceeds (after payment to the senior classes of claims) from (i) a $200,000 contribution from the Debtor's principals in four annual installments of $50,000, commencing on the first year after the effective date of the Plan, (ii) the Debtor's projected net operating income in the amount of $450,000 payable in four annual installments of $112,500, and (iii) projected net proceeds of the Debtor's litigation against 1143 Fifth, LLC. The Disclosure Statement and Plan define the proceeds of the foregoing as the "Pot," from which claims will be paid.

12. The Plan further provides that the Debtor's principals (including the Guarantor) shall retain their interests in the Debtor and receive a third-party release under the Plan (including specifically a release from claims under any guarantees) in consideration of the $200,000 contribution payable over four years.

4

**OBJECTION**

13. By this Objection, the Kunofskys respectfully request that this Court deny approval of the Disclosure Statement for the reasons set forth herein.

**I.    Standard Governing Approval of Disclosure Statements**

14. The Bankruptcy Code does not permit the solicitation of the acceptance or rejection of a plan unless the Court approves the disclosure statement in connection with the plan as containing "adequate information." Adequate information, in turn, is defined as "information of a kind, and in sufficient detail, . . . that would enable [ ] a hypothetical investor of the relevant class to make an informed judgment about the plan." 11 U.S.C. § 1125(a)(1).

15. Whether a disclosure statement contains adequate information should be determined on a case-by-case basis. *See in re PC Liquidation Corp.*, 383 B.R. 856, 865 (E.D.N.Y. 2008). At a minimum, however, the disclosure statement must "contain simple clear language delineating the consequences of the proposed plan on claims and the possible Code alternatives so that they can intelligently accept or reject the plan." *In re Copy Crafters Quickprint, Inc.*, 92 B.R. 973, 981 (Bankr. N.D.N.Y. 1988). The legislative history of section 1125 of the Bankruptcy Code states that "[t]he disclosure statement was intended by Congress to be the primary source of information upon which creditors and shareholders would make an informed judgment about a plan of reorganization." *In re Jeppson*, 66 B.R. 269, 291 (Bankr. D. Utah 1986). The purpose of a disclosure statement is "to give all creditors a source of information which allows them to make an informed choice regarding the approval or rejection of a plan." *Duff v. United States Trustee (In re California Fid., Inc.)*, 198 B.R. 567, 571 (B.A.P. 9th Cir. 1996). As a result, a disclosure statement should be approved only when it sets forth "all those factors presently known to the plan proponent that bear upon the success or failure of the proposals contained in the plan." *In re Scioto Valley*, 88 B.R. 168, 170 (Bankr. S.D. Ohio 1988).

16. Furthermore, because creditors rely on the disclosure statement prior to voting on or considering the *bona fides* of a plan, "it is crucial that a [plan proponent] be absolutely truthful" so that the disclosure statement satisfies section 1125(a)(1) of the Bankruptcy Code. *In re Galeria Des Monnaies of Geneva, Ltd.*, 55 B.R. 253, 259 (Bankr. S.D.N.Y. 1985). It is of prime importance that a proponent's disclosure be "full and fair." *In re Momentum Mfg. Corp.*, 25 F.3d 1132, 1136 (2d Cir. 1994). This requires, at a minimum, the disclosure statement to "clearly and succinctly inform the average unsecured creditor what it is going to get, when it is going to get it, and what contingencies there are to getting its distribution." *In re Ferretti*, 128 B.R. 16, 19 (Bankr. D.N.H. 1991).

17. Moreover, objections to a plan may be raised at hearing on the adequacy of the disclosure statement filed in connection with the plan, where the plan is facially unconfirmable. The case law is clear that a disclosure statement will not be approved where, as here, it describes a plan which is fatally flawed and thus incapable of confirmation. *See e.g., In re 18 RVC, LLC*, 485 B.R. 492 (Bankr. E.D.N.Y. 2012) ("[A] bankruptcy court should not approve a disclosure statement if the proposed plan which it describes is incapable of confirmation."); *In re GSC, Inc.*, 453 B.R. 132, 157 n. 27 (Bankr. S.D.N.Y. 2011); *In re Quigley Co.*, 377 B.R. 110, 115-16 (Bankr. S.D.N.Y. 2007) ("A disclosure statement must contain 'adequate information,' 11 U.S.C. § 1125(a) & (b), describing a confirmable plan. If the plan is patently unconfirmable on its face, the application to approve the disclosure statement must be denied, as solicitation of the vote would be futile.").

18. The Debtor's Disclosure Statement in this case does not contain adequate information that would enable a hypothetical investor to make an informed judgment about the

Plan, and the impermissible third party release contained in the Plan renders the Plan patently unconfirmable.

## II. The Disclosure Statement Does Not Contain Any Information To Support The Debtor's Projected Operating Income

19. According to the Debtor's estimates, the aggregate amount of claims (excluding general unsecured claims) is $635,539.51, which claims are to be paid in full under the Plan. The sources of funding for the Pot (excluding litigation proceeds against 1143 Fifth, LLC ) total $650,000, of which the majority is comprised of projected net income from the Debtor's post-confirmation operations in the amount of $450,000. Despite the Debtor's significant reliance on its net operating income to provide a substantial portion of the Plan funding, the Disclosure Statement contains no historical or other information to support or justify the Debtor's revenue projections and its does not discuss at all the effect of market conditions on the Debtor's ability to procure future contracts. The projections annexed as Exhibit A to the Disclosure Statement contains a single line item, with no detail whatsoever, that is simply listed as "Construction Income."

20. Disclosure regarding the Debtor's projected operating income is paramount here because the Debtor acknowledges that it will be changing its core business from general contractor to construction manager. There is no disclosure about how the Debtor's change in its core business will affect its ability to conduct business and generate income.

21. In addition, the Debtor states that it will assume only two construction contracts. Presumably, the Debtor will not generate sufficient net income to fund the Pot if it will only be working under two contracts. But there is no disclosure regarding any other construction contracts the Debtor has entered into and the value of such contracts (if any).

7

22. Given that the Debtor's net income is a cornerstone of the Debtor's proposed Plan funding, the lack of disclosure regarding the Debtor's post-confirmation operating income precludes approval of the Debtor's Disclosure Statement.

### III. The Disclosure Statement Does Not Adequately Disclose Information Regarding Litigation Claims

23. The Disclosure Statement asserts that at least $9,750,000 of general unsecured claims are litigation claims should be completely disregarded. Thus, the Debtor believes that over 75% of all general unsecured claims should be ignored. But the only basis that the Debtor provides in the Disclosure Statement for doing so is the single cursory, conclusory, and unsubstantiated statement that they are litigation claims that are disputed and not valid.

24. The enormous disparity between the total amount of general unsecured claims asserted against the Debtor and the Debtor's estimated amount of general unsecured claims receiving distributions under the Plan has a meaningful impact on the recovery creditors can expect to receive. Without proper disclosure to support the Debtor's justification for eliminating nearly $10 million in filed claims, creditors cannot make an informed judgement about the Plan. Furthermore, the Disclosure Statement does not discuss the projected costs that the Debtor will incur to litigate these substantial claims, or how it will pay for such litigation.

### IV. The Disclosure Statement Describes A Patently Unconfirmable Plan, Because The Plan Contains An Impermissible Third Party Release

25. The Disclosure Statement should not be approved because the Plan contains an impermissible third-party release, which makes the Plan unconfirmable as a matter of law.

26. Section 1129(a)(1) of the Bankruptcy Code requires a plan to comply with the applicable provisions of the Bankruptcy Code. One such applicable provision is section 524(e) of the Bankruptcy Code, which states that, with few exceptions, "discharge of a debt of the debtor does not affect the liability of any other entity on, or the property of any other entity for, such

8

debt." 11 U.S.C. § 524(e). Most courts that reject injunctions, exculpations and releases protecting non-debtor third parties do so on the basis that section 524(e) precludes such relief. *See Underhill v. Royal*, 769 F.2d 1426, 1432 (9th Cir. 1985) ("The bankruptcy court has no power to discharge the liabilities of a non-debtor pursuant to the consent of creditors as part of a reorganization plan. The broad language of section 524(e), limiting the scope of discharge so that it does not 'affect the liability of any other entity,' encompasses this result.").

27.    Some courts do allow injunctions that protect non-debtor third parties under extremely limited circumstances. These courts argue that although section 524(e) prevents the discharge from releasing non-debtor third parties, the court may, on *rare* occasions, and for *exceptional* circumstances, use its broad equitable powers under section 105 to grant injunctions against non-debtor third parties. These courts have granted such injunctions under a variety of theories, but always, either implicitly or explicitly, invoke the bankruptcy court's section 105 injunctive powers only when they have found authorization for such an injunction elsewhere in the Bankruptcy Code or under other state or federal law. *See In re Chauteaugay Corp.*, 167 B.R. 776 (S.D.N.Y. 1994) (holding that section 105(a) does not give a bankruptcy court unfettered discretion to discharge a non-debtor from liability). The language of section 105(a) limits the bankruptcy court's discretion to acts necessary or appropriate to carry out the purposes of the Bankruptcy Code, which was intended to provide protection to debtors, not non-debtors.

28.    Notwithstanding that courts have on rare occasions granted non-debtor releases, the Second Circuit views "third party plan releases more skeptically." *In re Dreier LLP*, 2010 WL 1707737 (Bankr. S.D.N.Y. Apr. 28, 2010) (referring to *Metromedia* and discussing with approval). The Second Circuit Court of Appeals made clear in *In re Metromedia Fiber Network, Inc.*, that the limited exceptions in which a non-consensual third party injunction could be granted were reserved

9

for "rare cases." 416 F.3d 136, 141 (2d Cir. 2005) ("While none of our cases explains when a nondebtor release is 'important' to a debtor's plan, it is clear that such a release is proper only in rare cases."). The *Metromedia* court provided the following guidance on issuing third party releases and injunctions:

> Courts have approved nondebtor releases when: the estate received substantial consideration; the enjoined claims were "channeled" to a settlement fund rather than extinguished; the enjoined claims would indirectly impact the debtor's reorganization by way of indemnity or contribution; and the plan otherwise provided for the full payment of the enjoined claims. Nondebtor releases also may be tolerated if the affected creditors consent. . . . But this is not a matter of factors and prongs. *No case has tolerated nondebtor releases absent the finding of circumstances that may be characterized as unique.* . . . A nondebtor release in a plan of reorganization should not be approved absent the finding that truly unusual circumstances render the release terms important to success of the plan.

416 F.3d at 142-43 (quotations and citations omitted) (emphasis added). *See also In re DBSD N. Am., Inc.*, 419 B.R. 179, 218 (Bankr. S.D.N.Y. 2009); *In re TCI 2 Holdings, Inc.*, 428 B.R. 117, 139 (Bankr. D.N.J. 2010) (requiring deletion of plan provision releasing third-party guarantor in order to confirm plan).

29. Judge Wiles has expressed his concerns about the increasing frequency of debtors including broad, non-consensual third party releases in chapter 11 plans in his recent decision in *In re Aegean Marine Petroleum Network Inc.*, 599 B.R. 717 (Bankr. S.D.N.Y. 2019), in which the court denied third party releases under a plan. Judge Wiles noted the following, which apply with equal force in this case:

> Debtors in chapter 11 cases before me frequently seek third-party releases, and they are often presented as though the involuntary imposition of a third-party release is no big deal. I disagree. In order to put the issue in context, it is worth pausing for a minute to note just what an extraordinary thing it is for a court to impose an involuntary third-party release and how different that is from what courts ordinarily do.

*In re Aegean Marine Petroleum Network Inc.*, 599 B.R. at 723. Judge Wiles went on to state:

10

> Unfortunately, in actual practice the parties usually ignore this portion of the *Metromedia* decision, and often seek to impose involuntary releases based solely on the contention that anybody who makes a contribution to the case has earned a third-party release. Almost every proposed Chapter 11 Plan that I receive includes proposed releases. Instead of targeting particular claims and explaining why the release of those particular claims is necessary to some feature of the reorganization, the proposed releases usually are as broad as possible in their scope. Parties rarely identify any particular claim that they are even worried about or that has been threatened, and almost never explain why an order extinguishing a particular third-party claim is fair to the party whose claim is being extinguished. Instead, I am usually told that various people have made contributions to the process that have been important in producing a successful outcome, and that they should be rewarded by being given third-party releases.
>
> Frankly, if this were enough then releases would never be limited to the "rare" and "unusual" circumstances that the court required in *Metromedia*. As I observed in the transcript from argument in the *Fairway* cases (which one of the parties cited here), and as I said earlier during argument today, third-party releases are not a merit badge that somebody gets in return for making a positive contribution to a restructuring. They are not a participation trophy, and they are not a gold star for doing a good job. Doing positive things in a restructuring case – even important positive things – is not enough. Nonconsensual releases are not supposed to be granted unless barring a particular claim is important in order to accomplish a particular feature of the restructuring.

*Id.* at 726-27.

30. As *Metromedia* teaches, the circumstances here must be "rare," "unique," or "unusual" in order to justify the third-party release under the Debtor's Plan, which would benefit the non-debtor Guarantor. But such is not the case here. This is a simple chapter 11 case, in which the principal of the Debtor gave a personal guarantee to guarantee the completion of work under the Contract and Amendment and the repayment of any advanced retainages under the Amendment. To provide the Guarantor a permanent injunction against prosecution would require the Court in this case to ignore the Second Circuit's binding mandate that third party releases and injunctions be reserved for unusual circumstances.

11

31. This case does not present any of the instances in which the *Metromedia* court deemed susceptible to the granting of a third party release. For example, the Debtor's estate here will not be receiving a "substantial" contribution;[2] there is no separate fund to which the Kunofskys' claims against the Guarantor may be satisfied; and the Debtor has no indemnity or contribution obligations with respect to the Guarantor. Nor is the third-party release itself important to the Plan. The third-party release has no effect on the Debtor, the property of the Debtor's estate or the Debtor's reorganization.

32. Moreover, as recognized in *In re Aegean Marine Petroleum*, granting the Guarantor a third party release in this case would have the anomalous result of providing the non-debtor Guarantor broader protection than he could have obtained in his own bankruptcy. *See In re Aegean Marine Petroleum Network Inc.*, 599 B.R. at 726.

33. Here, the Kunofskys signed the Amendment and paid approximately $227,000.00 directly to the Debtor's subcontractors and vendors and in reliance on the Debtor's and the Guarantor's fraudulent assurances that the Project could be completed under the new timetable. As described above, the Debtor and the Guarantor knew they would be unable to perform under the Contract or the Amendment; indeed, the Debtor could not even legally operate until July 15, 2019. Thus, in a bankruptcy of the Guarantor, the Kunofskys would be able to seek to preclude the Guarantor from discharging the Kunfoskys' claims under the Guarantee, because the Kunofskys were fraudulently induced to enter the Amendment and make the $227,000.00 advanced retainage payment thereunder.

---

[2] Even if the Debtor's incredible position that almost $10 million in litigation claims should be valued at $0, the Guarantor's contribution of $100,000 (over four years) constitutes less than 3% of the claims of unsecured creditors. If the litigation claims prove to be valid, the Guarantor's contribution would constitute less than 1% of the claims of unsecured creditors.

12

**V.      The Disclosure Statement Describes A Patently Unconfirmable Plan, Because The Plan Violates The Absolute Priority Rule**

34.     The Disclosure Statement should not be approved because the Plan violates the absolute priority rule, which makes the Plan unconfirmable as a matter of law.

35.     Section 1129(b)(2)(B)(ii) provides that, with respect to a dissenting class of unsecured claims, a plan must be fair and equitable by providing that unsecured claims will be paid in full or that no junior class of creditors will receive or retain any property under the plan. 11 U.S.C. § 1129(b)(2)(B)(ii). Courts have recognized an exception to this "absolute priority rule" in cases where equity interest holders make a substantial new value contribution under the plan. "For old equity to retain its interests pursuant to the exception, the capital contribution must be (1) new, (2) substantial, (3) money or money's worth, (4) necessary for a successful reorganization and (5) reasonably equivalent to the value or interest received." *In re One Times Square Assocs. Ltd. P'ship*, 159 B.R. 695, 707-08 (Bankr. S.D.N.Y. 1993).

36.     Furthermore, the new value contribution must be a ***present*** contribution, and a promise to make future payments cannot qualify as new value. *See In re Woodmere Investors Ltd. P'ship*, 178 B.R. 346, 363 (Bankr. S.D.N.Y. 1995) ("[I]t is settled law that a promise to pay future income is not 'new value.'"); *In re 8315 Fourth Ave. Corp.*, 172 B.R. 725, (Bankr. E.D.N.Y. 1994) ("Courts have routinely held that even a promissory note issued by an 'equity holder' is not money or money's worth because it is not a present contribution.") (collecting cases); *see also In re G-I Holdings Inc.*, 420 B.R. 216, 269 (D.N.J. 2009) ("To invoke the new value exception to the absolute priority rule, the qualifying new value contribution must be … proffered by the debtor at the outset, *i.e.*, 'up front.'").

37.     Here, there is no question that the Plan violates the absolute priority rule, because unsecured creditors are proposed to receive pennies on the dollar for their claims while the

Debtor's pre-petition equity holders will retain their ownership interests in the Debtor. Moreover, the new value contribution proposed under the Plan—a promise to pay future earnings from the principals in the amount of $200,000 over four years, with the first $50,000 paid *one year after the effective date of the Plan*—is, on its face, not sufficient to constitute new value justifying an exception to the absolute priority rule. Accordingly, the Plan fails to comply with section 1129(b)(2)(B)(ii) of the Bankruptcy and confirmation must be denied.

WHEREFORE, the Kunofskys respectfully request that this Court deny approval of the Disclosure Statement and grant such other relief as may be just and proper.

Dated: New York, New York
November 11, 2019

RUBIN LLC

By: */s/ Paul A. Rubin*
Paul A. Rubin
Hanh V. Huynh

345 Seventh Avenue, 21st Floor
New York, New York 10001
Tel: 212.390.8054
prubin@rubinlawllc.com
hhuynh@rubinlawllc.com